933 A.2d 997

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Robert Gene REGA, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 5, 2006.

Decided Oct. 17, 2007.

660

Clifford D. Schenkemeyer, Jr., Esq., Robbie Martin Taylor, Esq., Taylor Law Firm (The), for Robert Gene Rega.

Jeffrey D. Burkett, Esq., Jefferson County District Attorney's Office, Jennifer Anne Buck, Esq., Amy Zapp, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

BEFORE: CAPPY, C.J., and CASTILLE, SAYLOR, EAKIN, BAER and BALDWIN, JJ.

## *OPINION*

Justice BAER.

This is a direct appeal from a sentence of death imposed by the Jefferson County Court of Common Pleas following Appellant Robert Gene Rega's conviction for the first-degree murder of Christopher Lauth and the related crimes of robbery, burglary, theft by unlawful taking or disposition, aggravated assault, criminal mischief, unlawful restraint, theft by receiving stolen property, and criminal conspiracy.[1] For the following reasons, we affirm.

## I. Background

On December 21, 2000, at about 9:00 in the evening, Appellant and his friends Stanford (Stan) and Susan Jones (Susan), who were married, and Shawn Bair (Bair) were at Appellant's trailer residence bemoaning their lack of funds for Christmas presents for their children. Appellant devised a plan to rob the Gateway Lodge, where both he and Bair previously worked as night watchmen. Due to their prior employment,

---

1. We have jurisdiction over this direct appeal from a judgment of sentence of death pursuant to 42 Pa.C.S. § 722(4) and § 9711(h)(1).

Appellant and Bair were familiar with the Gateway Lodge and knew that there was a safe and an ATM machine, both of which contained substantial amounts of cash. The participants intended that during the robbery, nobody would get hurt.

Appellant and Bair believed that the current night watchman, Christopher Lauth, would be inside the building when they arrived, either doing laundry or rounds. Once they gained entry to the building, the group planned to take control of Lauth and direct him to call Ann Lipford, assistant innkeeper and the daughter of the owners of the Gateway Lodge, who resided on the premises, to obtain the key or pin number in order to open the ATM machine. The group further planned to take the safe and open it upon returning to Appellant's trailer. After completing the robbery, they planed to place Lipford and Lauth inside the kitchen's walk-in freezer with a sign indicating they were in there.

Although Appellant and Stan were ready and willing to carry out this plan, Bair needed further convincing. Due to Bair's reluctance, Appellant instructed Bair to contact Raymond Fishell (Fishell) to help. Bair called Fishell, who was at a bar in Punxsutawney. Stan, Susan, and Bair drove to the bar to retrieve Fishell and include him in the plan. When they found Fishell at the bar, he was already quite intoxicated. The group tried to sober him up with coffee.

After Stan, Susan and Bair returned to Appellant's trailer with Fishell, Appellant told Bair that if he participated in the robbery as a driver and look-out, he could still split the money with the rest of them. This convinced Bair, who agreed to participate. At Appellant's direction, Stan armed Fishell with a butcher knife. Appellant armed himself with a gun, concealed in his pants.[2] Susan agreed to stay behind and babysit

2. Two days before, on December 19, 2000, Appellant inquired of Morgan Jones whether he had any unregistered 9 mm. handguns for sale. Jones indicated that he did not. The next day, Appellant, Bair, Stan and Susan discussed their desire to obtain such a gun in order to commit robberies in the future. The group went to Jones' residence and stole the 9 mm. handgun used in the subsequent robbery of the Gateway Lodge. Appellant was eventually charged in connection with

Appellant's children, who were already in bed. The group, consisting of Appellant, Stan, Bair, and Fishell pulled stockings over their faces, put on gloves, and departed for the Gateway Lodge with Stan driving his distinctive 1989 Buick Century, which was badly in need of bodywork.

From the moment they arrived at the Gateway Lodge the plan went awry. Upon driving to the parking area, the group noticed that Lauth was not inside as expected, but outside, and, in fact, had watched them drive up, park, and turn off the lights. Because Stan's car was so distinctive and Lauth had watched them pull into the parking lot, the group immediately began to panic. Appellant decided that everyone should jump out of the car at the same time, because Lauth was approaching the car. All four doors opened at once, and everyone jumped out. Bair walked around the car and got into the driver's seat. Appellant, with his gun drawn, Stan and Fishell approached Lauth and took him into the kitchen of the Gateway Lodge. Bair stayed behind in the car, with a two-way radio to keep in contact with Appellant.

Once they had Lauth in the building, Fishell held Lauth at knifepoint while they directed him to call Ann Lipford, the owners' daughter living at the Gateway Lodge, as planned. Lauth's first attempt to call Lipford resulted in a wrong number to Stacy Oakes, a stranger to the parties who eventually testified at trial.[3] Lauth asked Oakes where Ann was, and hung up once he realized he dialed the wrong number. Fishell threatened Lauth not to make any more mistakes. Lauth tried again, this time dialing the correct number, but Lipford did not answer. Instead, Lauth reached her answering machine, and his voice was captured on her answering machine at 1:48 a.m. Appellant then used the two-way radio to ask Bair whether he saw Lipford's car in the parking lot. Bair looked around, and informed Appellant that he did not see her car. Realizing that she was not home, the group

this theft, and the charges were consolidated with the Gateway Lodge murder and related crimes.

**3.** Oakes' phone number differs from Lipford's phone number by one digit.

gained entry to her apartment and ransacked it, apparently looking for the key to the ATM.

The group proceeded to the room where the safe was kept. After locating it under a desk, Stan and Fishell began to move it while Appellant held Lauth at gunpoint. Appellant radioed Bair to tell him to pull Stan's Buick up so they could load the safe into it. As Fishell and Stan carried the safe to the car, Appellant fired several shots at the ATM in an unsuccessful attempt to break into it. The group also cut various wires in the office because they were concerned about police being notified somehow.

After failing to gain entry to the ATM and then cutting the wires in the office, Appellant moved Lauth into the kitchen at gunpoint. Fishell and Stan joined Appellant and Lauth. Upon Fishell and Stan's appearance in the kitchen, Appellant hit Lauth with his flashlight and then handed it to Fishell, instructing him to hit the victim. Fishell hit Lauth one time. Appellant then fired the gun at the freezer door in an attempt to open it. To escape any potential ricochet, Fishell returned to the car. At the same time, Stan found Lauth's vehicle in the parking lot and drove it over the hillside down an embankment, and then he returned to the car. Bair was still in the car, acting as a lookout. While Stan, Fishell, and Bair waited in the car, they heard a gunshot, a scream, a gurgling sound, and then another couple of gun shots. Appellant ran out of the building, got into the car, and directed Bair to drive.

While in the car, Appellant asked Stan whether he thought Appellant did the right thing. Stan indicated that he did. On the way back to Appellant's trailer, Appellant stated "I think I killed him." After arriving at Appellant's trailer, they used a grinder to open the safe. The group, along with Susan, separated the items from the safe and split the money four ways, about $5000 each. Appellant then instructed the group to put all credit cards and papers they found in the safe back into it, and took it to the car. They stuffed a kerosene soaked blanket into the safe, lit it on fire, and dumped it down an embankment. They then drove Fishell to his house. The group, minus Fishell, returned to Appellant's trailer, where

Bair stayed for the night. Stan and his wife returned to their own home. Before Stan and Susan left, Appellant handed them a bullet and told them it would be for them if they opened their mouths. Later in the day on December 22, 2000, Appellant gave his gun, wrapped inside a bag, to Stan. Stan put the wrapped gun in his car, drove away with his wife Susan, and threw the gun into a creek.

Employees of the Gateway Lodge arrived for work at 6:30 on the morning of December 22, 2000, and discovered Lauth's body. The employees also saw that the office and kitchen were in total disarray, with papers everywhere and tables overturned. The ATM had bullet holes in it.

When police arrived on the scene, they discovered that the safe was gone, and, because the safe was very heavy, surmised that a group of individuals were involved. Police also recovered Lauth's flashlight, which had blood on it. Because the group had not entered any part of the Gateway Lodge that did not need to be entered to complete the crime, and because Lipford's apartment had been ransacked as if the perpetrators had been looking for something, the investigators believed that they were employees of the Lodge.

At the time the crime was committed, Appellant's girlfriend was a Gateway Lodge employee. She kept Appellant abreast of the police investigation, at one point informing Appellant that the police were taking pictures of employees' shoes. Responding to this information, Appellant instructed everyone involved in the robbery and shooting to dispose of their shoes.

The police investigation soon focused on Appellant because of his past employment as the night watchman. The police conducted interviews with people close to Appellant, including Bair, Stan, and Stan's wife, Susan. When the police interviewed Susan, she informed police that Appellant had told her that he had to kill Lauth because someone's name had been mentioned during the robbery, potentially revealing their identity to the victim.[4]

4. There is no evidence in the record, other than Susan's testimony, regarding whether Lauth actually heard anyone's name or whether this was really the reason Appellant killed Lauth.

While police were investigating the crimes, Appellant approached Michael Sharp and asked him to provide an alibi. Sharp shared a criminal history with Appellant, regarding a van the two had stolen together. The theft of the van occurred two weeks prior to the Lauth murder, and resulted in charges brought against Sharp for receiving stolen property and criminal conspiracy to receive stolen property. Appellant instructed Sharp to tell anyone who asked that Sharp was with Appellant at Appellant's trailer on the night of December 21, 2000. Sharp complied with Appellant's request, occasioning him to lie to police on two separate occasions. Unfortunately for Appellant, however, Sharp was unable to keep his story straight, and eventually confessed that Appellant had asked him to provide an alibi and that he had not, in fact, been with Appellant on December 21, 2000.

On January 3, 2001, Trooper Louis Davis interviewed Appellant. Appellant revealed to Trooper Davis that at the beginning of December 2000, he was completely broke. He was unable to purchase a van, pay his debts, or regain the collateral that was held for these debts. However, Appellant inadvertantly revealed that at the end of December 2000, after the Gateway Lodge robbery, he purchased a Dodge Neon, for $1750 in cash. He also paid for the transfer of title in cash, and paid $650 in cash for a new paint job. At the same time that the police were interviewing Appellant, they were also questioning Bair. When Bair and Appellant passed each other in the hallway of the police station, Appellant instructed Bair not to say anything. This instruction was overheard by police, who testified regarding it at trial.

Two days later Trooper Davis again interviewed Bair, who admitted what transpired at the Gateway Lodge on the night of December 21, 2000. Shortly after Bair revealed what had happened and who was involved, Stan also confessed to the police, implicating Fishell. Eventually, all of Appellant's co-conspirators identified him as the shooter.

Trooper Davis interviewed Appellant a second time, on January 5, 2001, after having interviewed Stan and Bair and obtaining statements from them. At that point, Appellant was

very concerned with what Bair and Stan had been saying about him. He attempted to convince Trooper Davis to reveal to him what Bair and Stan had told police. When Trooper Davis refused to reveal this information, Appellant attempted to barter in an attempt to reach a deal. He said that he could tell Trooper Davis everything he wanted to know about the previous twenty days, and acknowledged that the information would be incriminating. Accordingly, Appellant conditioned his willingness to talk on Trooper Davis promising him that he would not be charged based on what he revealed. Trooper Davis refused to give Appellant any assurances, and Appellant deliberated, saying that he was playing out in his head what was going to happen. Appellant decided to reveal nothing else at that time.

Appellant was arrested on January 9, 2001, and charged with homicide and related offenses for the events that occurred at the Gateway Lodge on December 21, 2000. After being charged with criminal homicide, Appellant was again interviewed by police. At this January 10, 2001 interview, Appellant attempted to explain away his sudden infusion of cash by saying that his sister had loaned him the money. Appellant then revealed a tremendous amount of detail about the homicide and the events surrounding it, but he asserted that his role was limited to assisting Bair and Stan after the fact, by allowing them to use his grinder to open the safe, after they had robbed the Gateway Lodge. He described where the gun could be found, which he described in detail, and where the two-way radios were. During this interview, Appellant became aware of Susan's cooperation with the police and that she had told them that she watched Appellant's children on the night of the murder. He became very angry at this news. Later that day he telephoned Susan and threatened her, calling her a snitch.

Prior to trial, the Commonwealth uncovered evidence of possible jury tampering involving Appellant and his mother.[5]

5. *See* 42 Pa.C.S. § 4583 ("Any person who ... shall thereafter discuss with any prospective juror the facts or alleged facts of any particular suit or cause then listed for trial in the court for which the prospective

Trooper Davis obtained a recorded conversation between Appellant, in jail, and his mother, Ms. Rega, in which they discussed the possibility of planting a family friend on the jury.[6] A search warrant was executed at the home of Appellant's mother to search for evidence of jury tampering.

In executing this search warrant relating to jury tampering, police found two letters from Appellant to his mother in which Appellant asked his mother, Ms. Rega, to find somebody who would give him an alibi for $500. He outlined the exact testimony he wanted from this alibi witness to demonstrate that he was not at the Gateway Lodge on December 21, 2000. In another letter he instructed his mother how she should testify. At the subsequent trial, the Commonwealth introduced testimony regarding the searches and the evidence found in Ms. Rega's home in connection with jury tampering and witness tampering.[7]

Also in connection with investigating the possible crime of jury tampering, the trial judge suspected that Appellant possessed jury lists in his jail cell. Although the record is not clear on this point, we surmise that this suspicion arose from the recorded conversations between Appellant and his mother regarding their attempt to plant a family member on the jury. The judge took the unusual step of accompanying Appellant's counsel to Appellant's cell, and waited outside while counsel reviewed files with Appellant to determine whether he possessed jury lists. As will be discussed later in this opinion, no evidence was found in Appellant's cell.

juror has been summoned for jury service, with the intent to influence the juror in his service or in the consideration of the evidence in the matter, commits a misdemeanor of the second degree.").

**6.** These conversations were recorded pursuant to the Wiretap Act, 18 Pa.C.S. § 5701 *et seq.*

**7.** *See* 18 Pa.C.S. § 4909 ("A person commits a felony of the third degree if he solicits, accepts or agrees to accept any benefit in consideration of his doing any of the things specified in section 4952(a)(1) through (6) (relating to intimidation of witnesses or victims)) and 18 Pa.C.S. § 4952(a) ('A person commits an offense if, with the intent to or with the knowledge that his conduct will obstruct, impede, impair, prevent or interfere with the administration of criminal justice, he intimidates or attempts to intimidate any witness or victim. . . .' ").

At trial, the Commonwealth introduced the testimony of Dr. Vey, who performed Lauth's autopsy. Dr. Vey concluded that Lauth had been shot three times and that the angle of the bullet trajectory indicated that Lauth had been on his knees when he was shot. The Commonwealth also adduced testimony and evidence regarding Appellant's lack of funds before the robbery of the Gateway Lodge and his infusion of cash afterwards. His purchases after the robbery included $540 towards a bill at a music store, $540 for a car stereo, $162 for car tires, $258 for a ring for his wife, $400 for toys for his children, and the Dodge Neon and its paint job mentioned above.

Trooper Davis, Sharp, who Appellant sought out to provide him an alibi, Fishell, Bair, Stan and Susan all testified against Appellant. Sharp testified that he was not with Appellant on the night of December 21, 2000, as he had initially told police, and that he had lied at Appellant's request. The trial court did not consider Sharp to be an accomplice, and therefore did not instruct the jury that Sharp was a corrupt and polluted source whose testimony should be viewed with caution. *See Commonwealth v. Hudson*, 489 Pa. 620, 414 A.2d 1381 (1980).

Bair testified that he believed Appellant killed Lauth. He described his role in the theft of the gun and the development of the plan to rob the Gateway Lodge, including his initial reluctance and Appellant's role in organizing the group and planning the details. Bair then outlined precisely what he saw from his position as lookout, including Appellant approaching the victim with the gun and taking him inside when the perpetrators initially arrived at the lodge Bair also testified that after the safe was loaded in the car and Stan and Fishell were back in the car waiting for Appellant, Bair heard several gunshots, a scream, a gurgling sound, and saw Appellant run to the car, after which Appellant stated that he thought he killed Lauth.

Fishell also testified, stating that he believed Appellant killed the victim. Fishell corroborated Bair's testimony and also added his account of what occurred inside the Gateway Lodge, testifying that Appellant and he each hit the victim

with a flashlight, and that Appellant fired several shots at the freezer. Fishell recounted that he had feared being hit with a ricochet from these shots, and, so, had returned to the car where he joined Bair and waited until Stan and, eventually, Appellant joined them. Fishell recalled that when Appellant returned to the car after the shots were fired, he asked whether he had done the right thing. Stan also testified that he believed Appellant was the shooter, and stated that on the ride home from the Gateway Lodge, Appellant stated that he had shot and killed the victim.

The six-day jury trial concluded on June 20, 2002. Appellant was found guilty of murder in the first degree, robbery, burglary, theft by unlawful taking or disposition, aggravated assault, criminal mischief, unlawful restraint, theft by receiving stolen property, and criminal conspiracy.

During the penalty phase, the prosecutor presented the victim impact testimony of David Planker, the victim's half-brother. Following the penalty phase, the jury recommended that Appellant be sentenced to death after finding two statutory aggravating circumstances and one mitigating circumstance.[8] Following the June 21, 2002 sentencing hearing the trial court imposed the sentence of death.

Appellant was represented throughout trial by attorneys Michael English and Ronald Elliott. Attorney English filed post-trial motions on July 8, 2002. On July 15, 2002, Appellant requested Attorneys English and Elliott's withdrawal, alleging their incompetence. The trial court granted this request and appointed new counsel. In due course, appellate counsel filed amended post-trial motions on January 20, 2005. The trial court held a hearing to address Appellant's ineffectiveness claims, at which Attorneys English and Elliott testified. The trial court subsequently found that all of the issues lacked merit, and denied the post-trial motions.

---

**8.** The two aggravating circumstances were that Appellant had committed the murder while in the perpetration of a felony, and that he possessed a significant history of felony convictions involving the use or threat of violence. *See* 42 Pa.C.S. §§ 9711(d)(6) and (9). The mitigating circumstance was the ages of Appellant's children, which fell into the catch-all mitigator. *See* 42 Pa.C.S. § 9711(e)(8).

## II. Sufficiency of the Evidence

As we do in all capital cases, we begin our review with an examination of the sufficiency of the evidence. *Commonwealth v. Sanchez*, 589 Pa. 43, 907 A.2d 477, 486–87 (2006); *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982). The standard is whether the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, is adequate to enable a reasonable jury to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Markman*, 591 Pa. 249, 916 A.2d 586, 597–98 (2007); *Commonwealth v. Watkins*, 577 Pa. 194, 843 A.2d 1203, 1211 (2003). Evidence is sufficient to sustain a conviction of first-degree murder when the Commonwealth establishes that (1) a person was unlawfully killed; (2) the person accused did the killing; and (3) the accused acted with specific intent to kill. 18 Pa.C.S. §§ 2501, 2502(a), (d); *Commonwealth v. Solano*, 588 Pa. 716, 906 A.2d 1180,1183–84 (2006); *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1283 (2000). An intentional killing is one committed by means of poison, lying in wait, or by any other kind of willful, deliberate, and premeditated action. *Commonwealth v. Taylor*, 583 Pa. 170, 876 A.2d 916 (2005). The use of a deadly weapon on a vital part of the body is sufficient to establish the specific intent to kill. *Commonwealth v. Walker*, 540 Pa. 80, 656 A.2d 90 (1995).

Viewed in accordance with these standards, we find the evidence sufficient to support Appellant's conviction. The Commonwealth presented expert testimony from a forensic pathologist, Dr. Vey, concerning his examination of the victim's body and his opinion that the cause of death was homicide, specifically, three gunshot wounds to the head and trunk, which caused death immediately. Testimony from Appellant's co-conspirators directly implicated Appellant as the killer, and was corroborated by circumstantial evidence regarding Appellant's financial position before and after the murder, the theft of the gun used in the murder, and his role in opening the safe, distributing the money, and disposing of the evidence. Further, Appellant's behavior after his arrest

demonstrates Appellant's consciousness of guilt. For example, Appellant threatened Susan, conspired with his mother to tamper with the jury, attempted to concoct an alibi with Sharp and, when that fell through, sought the help of his mother to buy another alibi. This Court has long recognized that any attempt by a defendant to interfere with a witness's testimony is admissible to show a defendant's consciousness of guilt. *See, e.g., Commonwealth v. Johnson,* 576 Pa. 23, 838 A.2d 663, 680 (2003) (finding that statements intended to influence a witness at trial demonstrated consciousness of guilt); *Commonwealth v. Johnson,* 542 Pa. 384, 668 A.2d 97, 104 (1995) (concluding that a witness's testimony that a defendant offered him a bribe not to testify at trial was admissible to show the defendant's consciousness of guilt); *Commonwealth v. Goldblum,* 498 Pa. 455, 447 A.2d 234, 243 (1982) (citing cases for the proposition that the Commonwealth may demonstrate consciousness of guilt through attempts by a defendant to intimidate or influence a witness). Finally, the manner in which Appellant killed the victim, hitting him with a flashlight and firing three shots into his head and trunk serves as circumstantial evidence of malice and intent to kill on Appellant's part. *See Commonwealth v. Collins,* 550 Pa. 46, 703 A.2d 418, 420 (1997) ("Specific intent to kill may be proven by circumstantial evidence, such as the accused using a deadly weapon on a vital part of the victim's body.").

### III. Search relating to jury tampering

In his first substantive guilt phase issue, Appellant takes issue with the admission of evidence discovered pursuant to a search of his mother's house during the investigation of jury tampering. He asserts that the warrant authorizing the search was overly broad and was thus unlawful.

In the affidavit of probable cause submitted to obtain the search warrant, Corporal Jeffrey Lee averred the following information: that the jury pool had been selected and jury questionnaires turned over to Appellant's attorneys, who indicated that they had passed on those questionnaires to Appellant; the District Attorney had requested and received tape-

recorded conversations between Appellant and his mother pursuant to the Wiretap Act, 18 Pa.C.S. § 5701 *et seq;* Corporal Lee identified the voices of Appellant and his mother on the tapes; these conversations revealed that Ms. Rega had received juror list information that she was perusing and marking during her conversation with Appellant; Ms. Rega had disseminated the jury lists to friends and family in an attempt to find a connection with a juror; in a conversation on June 2, 2002, Ms. Rega and Appellant discussed a family member's relationship with a juror, who was the sister-in-law of this relative; she was willing to talk to the juror but needed to know what questions to ask; Corporal Lee uncovered the identity of this relative and interviewed her, and confirmed that she had, in fact, discussed her sister-in-law, who was on the proposed jury list, with Ms. Rega. The affidavit concluded that "[t]here is probable cause to believe that juror questionnaires/lists, etc., will be found in the above-referenced mobile home and that there will be markings identifying the targeted juror(s)." Trial Court opinion at 7. Although the affidavit of probable cause spoke in terms of "juror questionnaires/lists, etc.," the search warrant permitted the search of Ms. Rega's home for "Jefferson County Jury Questionnaires, Jury List[s], and any and all papers, documents containing the names of prospective jurors."

Appellant asserts that the affidavit of probable cause identified only jury questionnaires and lists, so that the issuing authority, by granting a search warrant for "any and all papers, documents containing names of prospective jurors," improperly expanded the scope of the warrant in violation of Rule 203 of the Rules of Criminal Procedure, which provides that the issuing authority, "in determining whether probable cause has been established, may not consider any evidence outside the affidavits." Thus, Appellant argues, there was no basis to search or seize any document beyond juror questionnaires or jury lists. The broadened warrant, avers Appellant, required the police to first obtain a list of prospective jurors, of which there were over 200, then read every piece of paper found in Ms. Rega's home to see if it contained the name of

any juror. Appellant concedes that Corporal Lee included "etc." following "juror questionnaires/lists" in the affidavit, but asserts that this inclusion cannot operate as a license to search any and all scraps of paper found in the residence.[9] Because of this alleged broadening of the search warrant from the four corners of the affidavit of probable cause, Appellant argues that the trial court abused its discretion by admitting evidence obtained from an overly broad search warrant.

In advancing this argument, Appellant relies on *Commonwealth v. Grossman*, 521 Pa. 290, 555 A.2d 896 (1989), in which we concluded that an affidavit of probable cause detailing complaints by three of an insurance agent's clients did not authorize a search warrant permitting seizure of all of the files in the agent's office. We therefore decided that the seizure of over 2000 client files was overly broad requiring the granting of a suppression motion: "The warrant authorizing seizure of 'all files' was unconstitutionally overbroad in its failure to describe as specifically as was reasonably possible the three files described in the affidavit for which there was probable cause." *Id.* at 299, 555 A.2d 896.

The Commonwealth argues that the search warrant issue here was not overbroad and, unlike *Grossman*, the warrant did not authorize the search of any items for which there was not probable cause.[10] We agree with the Commonwealth.

9. Appellant also asserts that at the time Corporal Lee executed the affidavit of probable cause, the jury questionnaires had not yet been released by the trial court to any party, so that the jury questionnaires identified in the affidavit could not have been in the possession of Appellant or his mother. He does not develop this argument in any way, or point to any part of the record that could substantiate this claim. Nor does he explain why his attorneys told Corporal Lee that they had turned such documents over to Appellant and how it was that he came to discuss documents with his mother that he now asserts he did not possess. In any event, this assertion does not impact the conclusion that the affidavit of probable cause and the subsequent warrant properly permitted the search and seizure of documents related to the jury lists from Ms. Rega's house.

10. The parties focus on the merits of the issue of whether the search warrant was lawful. As secondary arguments, the Commonwealth also asserts that, despite his ownership of the trailer, Appellant did not have a reasonable expectation of privacy in his mother's trailer or in letters sent to his mother through the mail. Appellant provides no argument

■ A search warrant cannot be used as a general investigatory tool to uncover evidence of a crime. *In re Casale,* 512 Pa. 548, 517 A.2d 1260, 1263 (1986); *Commonwealth ex rel. Ensor v. Cummings,* 416 Pa. 510, 207 A.2d 230, 231 (1965). Nor may a warrant be so ambiguous as to allow the executing officers to pick and choose among an individual's possessions to find which items to seize, which would result in the general "rummaging" banned by the Fourth Amendment. *See Commonwealth v. Santner,* 308 Pa.Super. 67, 454 A.2d 24 (1982) (quoting *Marron v. United States,* 275 U.S. 192, 195, 48 S.Ct. 74, 72 L.Ed. 231 (1927)). Thus, Pa.R.Crim.P. 205 specifies the necessary components of a valid search warrant.[11] The comment to Rule 205 provides, however, that even though general or exploratory searches are not permitted, search warrants should "be read in a common sense fashion and should not be invalidated by hypertechnical interpretations. This may mean, for instance, that when an exact description of a partic-

in response. Assuming arguendo that Appellant had a reasonable expectation of privacy in his mother's trailer and the letters, we find no merit to his argument that the search warrant was unlawful.

11. Rule 205. Contents of Search Warrant

Each search warrant shall be signed by the issuing authority and shall:

(1) specify the date and time of issuance;

(2) identify specifically the property to be seized;

(3) name or describe with particularity the person or place to be searched;

(4) direct that the search be executed either;

(a) within a specified period of time, not to exceed 2 days from the time of issuance, or;

(b) when the warrant is issued for a prospective event, only after the specified event has occurred;

(5) direct that the warrant be served in the daytime unless otherwise authorized on the warrant, provided that, for purposes of the rules of Chapter 200. Part A, the term "daytime" shall be used to mean the hours of 6 a.m. to 10 p.m.;

(6) designate by title the judicial officer to whom the warrant shall be returned;

(7) certify that the issuing authority has found probable cause based upon the facts sworn to or affirmed before the issuing authority by written affidavit(s) attached to the warrant; and

(8) when applicable, certify on the face of the warrant that for good cause shown the affidavit(s) is sealed pursuant to Rule 211 and state the length of time the affidavit(s) will be sealed.

Pa.R.Crim.P. Rule 205.

ular item is not possible, a generic description will suffice." Pa.R.Crim.P. 205 (cmt.). Embracing this approach, we have held that "where the items to be seized are as precisely identified as the nature of the activity permits ... the searching officer is only required to describe the general class of the item he is seeking." *Commonwealth v. Matthews*, 446 Pa. 65, 285 A.2d 510 (1971).

▆▆▆▆ A warrant is defective when its explanatory narrative does not describe as clearly as possible those items for which there is probable cause to search. *Grossman*, 521 Pa. 290, 555 A.2d 896. In assessing the validity of a description contained in a warrant, a court must initially determine for what items there was probable cause to search. *Id.* at 900. "The sufficiency of the description [in the warrant] must then be measured against those items for which there was probable cause. Any unreasonable discrepancy between the items for which there was probable cause [to search] and the description in the warrant requires suppression." *Id.*

Appellant does not argue that probable cause did not exist for "juror questionnaires/lists, etc." as articulated by Corporal Lee in the affidavit of probable cause. Therefore, we must measure the description contained in the warrant, "Jefferson County Jury Questionnaires, Jury List[s], and any and all papers, documents containing the names of prospective jurors," against those items for which there was probable cause, "juror questionnaires/lists, etc." Comparing these two phrases we have no problem concluding that "juror questionnaires/lists, etc.," for which probable cause unquestionably existed, encompassed not only jury questionnaires and lists, but also any papers and documents containing the names of prospective jurors. The issuing authority, who uses a "totality of the circumstances" approach to determine the scope of the warrant, *Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921, 926 (1985), examined the affidavit of probable cause and concluded that documents and/or papers containing juror information would be found at Ms. Rega's home.

Corporal Lee discovered, from Appellant's attorneys, that Appellant had received the jury questionnaires, and the recorded phone conversations with his mother indicated that he had passed them on to her and that she had, in turn, distributed them to friends and family. As the trial court found in rejecting Appellant's contention that the search warrant was unconstitutionally broad, common sense dictated that in the process, Ms. Rega easily could have copied some of that information onto other papers and documents besides the official lists and questionnaires. By limiting the scope to documents related to the juror lists, the issuing authority clearly limited the scope of the search. Moreover, the term "list," for which the police had probable cause to search, could be viewed broadly enough to encompass any document that contained multiple juror's names. Due deference will be given to the conclusions of the issuing magistrate. *Commonwealth v. Rompilla*, 539 Pa. 499, 653 A.2d 626, 632 (1995).

For this reason, we also agree with the Commonwealth that *Grossman* is distinct from this case. There, probable cause existed that evidence of a crime would be found with regard to three client files. *Grossman*, 555 A.2d at 897. The police, however, obtained and executed a search warrant that permitted the seizure of over 2000 client files. In finding the warrant overly broad, we found that there were no facts articulated that would give rise to probable cause to believe that evidence of a crime would be found within any file other than the three specified. *Id.* at 900. In contrast, the affidavit here provided probable cause to believe that evidence of a crime would be found in all documents and papers containing juror information, and the warrant plainly was tailored to permit seizure of those papers pertaining to jurors. Thus, unlike in *Grossman*, it was not overly broad.

Finally, Appellant seems to advocate the position that because the warrant, by its very nature, would require the police to search in any part of the property that could conceivably hold papers or documents, it is overbroad. However, a lawful search generally extends to the entire area in which the

object of the search may be found. *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).

### IV. Search relating to witness tampering

While executing the search warrant of Ms. Rega's house to look for documents relating to jury tampering, the police came across two envelopes, each containing a single sheet of paper addressed by Appellant to his mother. The police read these letters, and discovered that they did not pertain to jury tampering, but indicated that Appellant was trying to have his mother find someone who would be willing to say that he was with Appellant on December 21, 2000, in exchange for $500. Police, in turn, used these two documents as the basis to obtain a second search warrant to look for papers relating to the separate crimes of witness tampering and inducing perjury.

Appellant asserts that because the jury questionnaires, which the first warrant authorized the police to seize, were hundreds of pages long, the police were not justified in opening up and reading the contents of envelopes that clearly did not contain such hefty documents. Thus, he requests a new trial to remedy the trial court's admission of the two envelopes and any evidence derived from them.

The Commonwealth asserts that there is no authority for the proposition that the police, being lawfully on the premises pursuant to the first search warrant, and lawfully looking for written documents containing juror information, should not have looked at the documents inside the two envelopes. Although the search warrant pertained to evidence of jury tampering, the Commonwealth asserts that the police lawfully came upon this evidence of witness tampering and properly used the two letters as the basis to obtain a second search warrant.

The factual premise on which Appellant's argument is based is simply incorrect. It is not accurate, as Appellant asserts, that the police, in executing the warrant for juror questionnaires, lists, etc., were only authorized to search for jury

questionnaires hundreds of pages in length. Pursuant to our discussion of the previous argument, the warrant properly authorized a search for papers and documents containing the names of prospective jurors. These documents could conceivably be one page documents. In fact, the only way the executing officers could determine whether a particular piece of paper contained the names of prospective jurors was to look at it. Accordingly, after properly scanning the letters and reaching the conclusion that they were not relevant to the crime of jury tampering, the police officers stopped further search of these documents, and obtained a second search warrant, specifically authorizing them to look for papers related to the separate crime of witness tampering. There was nothing improper in this course of action.[12]

### V. Accomplice witness instruction

Michael Sharp is the individual with whom Appellant attempted to steal a van prior to the Gateway Lodge murder. Appellant also approached Sharp and requested that he provide Appellant with an alibi. Sharp initially complied but soon told the police the truth that he had not been with Appellant on the night of the murder. At trial, Sharp testified against Appellant on the Commonwealth's behalf, and explained to the jury that he had lied to police about Appellant's whereabouts because Appellant asked him to, and that he had spent some time in jail as a result. The trial court gave an accomplice witness instruction with regard to Bair, Fishell, Stan, and Susan, providing that the witness's testimony should be received with caution, but did not include Sharp in that list.

12. Appellant lists as a separate issue his argument that all evidence derived from the two warrants, regarding both jury tampering and witness tampering, should have been suppressed, and emphasizes the importance of the requirement of probable cause and the exclusionary rule to our jurisprudence. *See Commonwealth v. Ruey*, 586 Pa. 230, 892 A.2d 802, 808 (2006) ("Pursuant to the so-called exclusionary rule, '[e]vidence discovered as a result of a search that violates the fundamental constitutional guarantees of Article I, Section 8 will be suppressed.' "). Because we do not believe that either search warrant in this case was faulty or that any evidence seized in accordance with them should be suppressed, we accordingly reject this generalized argument.

Appellant argues that he should be awarded a new trial to remedy the trial court's failure to instruct the jury regarding the allegedly unreliable testimony of Sharp, who Appellant argues is an accomplice after the fact because he was charged with hindering apprehension or prosecution and providing a false alibi.

The Commonwealth points out that Appellant's counsel did not request such a charge with respect to Sharp. Further, the Commonwealth asserts that if they had, the trial court would properly have rejected such a request because to receive an accomplice witness instruction with regard to a certain witness, that witness must have been an accomplice in the crimes charged against the defendant. *See* 18 Pa.C.S. § 306(c). Because Sharp was not charged with any crimes relating to the murder of Lauth and played no role in the commission of that crime or the related robbery and burglary, he was not an accomplice, and Pennsylvania does not consider an accomplice after the fact to be an accomplice. *Id.*

In any case where an accomplice implicates the defendant, the trial court should tell the jury that the accomplice is a corrupt and polluted source whose testimony should be viewed with great caution. *Hudson*, 489 Pa. 620, 414 A.2d 1381; *Commonwealth v. Turner*, 367 Pa. 403, 80 A.2d 708 (1951). An accomplice is defined as follows:

(c) Accomplice defined.—A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it; or

(2) his conduct is expressly declared by law to establish his complicity.

18 Pa.C.S. § 306(c). An accomplice is one who "actively and purposefully engages in criminal activity [and is] criminally responsible for the criminal actions of his/her co-conspirators

which are committed in furtherance of the criminal endeavor." *Commonwealth v. Vining*, 744 A.2d 310 (Pa.Super.1999). Accordingly, two prongs must be satisfied for a person to be labeled an "accomplice." *Commonwealth v. Murphy*, 577 Pa. 275, 844 A.2d 1228, 1234 (2004). First, there must be evidence that the person intended to aid or promote the underlying offense. *Id.* Second, there must be evidence that the person actively participated in the crime by soliciting, aiding, or agreeing to aid the principal. *Id.* Further, a person cannot be an accomplice simply based on evidence that he knew about the crime or was present at the crime scene. *Id.; Commonwealth v. Wagaman*, 426 Pa.Super. 396, 627 A.2d 735, 740 (1993). There must be some additional evidence that the person intended to aid in the commission of the underlying crime, and then aided or attempted to aid. *Murphy*, 844 A.2d at 1234.

Sharp was not an accomplice to any of the crimes for which Appellant was charged: criminal homicide, robbery, burglary, theft by unlawful taking or disposition, aggravated assault, criminal mischief, unlawful restraint, theft by receiving stolen property, and criminal conspiracy to commit robbery, burglary, unlawful restraint, and theft, all in relation to the robbery and murder at the Gateway Lodge. Rather, regarding this incident, Sharp was charged with hindering apprehension or prosecution for providing a false alibi for Appellant. Because the trial we are reviewing for error herein did not involve witness tampering, Sharp played no role in the crimes for which Appellant was on trial. Thus, Sharp was not an accomplice for purposes of the accomplice witness instruction and Appellant was not entitled to such an instruction.

### VI. Michael Sharp's testimony

■ Appellant next asserts that he should be awarded a new trial due to the trial court's failure to grant a mistrial following a portion of Sharp's testimony. On direct examination, in response to a question regarding whether he had had a discussion with Appellant, Sharp answered that they had discussed "a conspiracy for a van that he wanted me to hide."

The prosecutor immediately requested a sidebar to instruct Sharp not to talk about the van. Appellant's counsel requested a mistrial. The trial court denied the request, explaining that Sharp's answer had been so inaudible that the trial court had not heard it, at least one juror indicated that she did not hear the answer, Appellant's counsel were not even sure what was said, and the court reporter was unable to understand it. N.T., 6/15/2002, at 254–59. The trial court gave Appellant's counsel the option of having it directly instruct the jury to disregard any reference to a van. Counsel declined this offer, requesting instead a mistrial. The trial court refused to grant a mistrial but, just in case the jury had heard the answer, instructed them to disregard it:

> Ladies and gentlemen, I do have an instruction for you at this point, and I will follow up on kind of what [a juror] said when she raised her hand [indicating she was unable to hear Sharp's testimony]. I could not make out the answer Mr. Sharp said. I don't know whether any of you made it out, but I will ask you to disregard it. That's why I checked the official record, and our court reporter has not made out what it was. So, whatever you heard from that answer just completely disregard it, and we will start with a clean question and answer now that Mr. Sharp seems to be speaking nicely in to the microphone loud and clear. So, we will pick up there.

*Id.* at 258. Appellant argues that the prejudicial effect of Sharp's answer is obvious, as demonstrated by the prosecutor's immediate request for a sidebar. He further argues that the cautionary instruction was insufficient to cure the prejudice.

The Commonwealth points out that no one was sure what, exactly, Sharp said, because his response was inaudible. Even if the jury did hear, the Commonwealth asserts that it could not have had the unavoidable effect of depriving Appellant of a fair trial as it was isolated and not put into any context. Further, if the jury did hear it, the Commonwealth argues that the trial court properly instructed them to disregard it.

■■■■ Our standard of review in assessing the denial of a mistrial is as follows:

> The trial court is in the best position to assess the effect of an allegedly prejudicial statement on the jury, and as such, the grant or denial of a mistrial will not be overturned absent an abuse of discretion. A mistrial may be granted only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. Likewise, a mistrial is not necessary where cautionary instructions are adequate to overcome any possible prejudice.

*Commonwealth v. Simpson,* 562 Pa. 255, 754 A.2d 1264, 1272 (2000) (internal citations omitted).

■■■■ The trial court was in the best position to assess the extent of prejudice resulting from Sharp's remark. As the court stated at trial, it was not clear to what extent the jury heard Sharp's answer. Even assuming *arguendo* that the jury heard the reference, we do not believe that Appellant has demonstrated that he was prejudiced by this statement so that "its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Id.* No further reference to the van was made, and the trial court specifically instructed the jury to disregard Sharp's answer. In most instances, the law presumes that the jury will follow the instructions of the court. *See Commonwealth v. Brown,* 567 Pa. 272, 786 A.2d 961, 971 (2001). Appellant here failed to demonstrate that this case falls within any of the narrow exceptions to that rule. Thus, no relief on this claim is warranted.

### VII. Trooper Kopas's testimony

■■■■ Trooper Kopas testified for the Commonwealth regarding his interview of Appellant and Bair the day after the murder. He testified that Appellant told him that he had spent the night in his trailer and in the morning went to DuBois with Bair and Appellant's two daughters. Trooper Kopas further testified that Bair told him that he and Appel-

lant went to DuBois, but had dropped Appellant's daughters off at Appellant's mother's house first. The trial court permitted the testimony but instructed the jury that "[y]ou are not to consider the statement for the truth of the matter asserted, but for the truth of the statement. You are to consider it simply for the fact that Mr. Bair made the statement." N.T 6/14/2002 at 172.

Appellant argues that the trial court should not have permitted Trooper Kopas to testify about statements made by Bair because such statements were inadmissible hearsay, and that the trial court further confused the jury when it misspoke and instructed them to consider the statement "for the truth of the statement." Appellant asserts that allowing Trooper Kopas to testify as to what Bair had told him gave the appearance that Appellant had been lying about his whereabouts. As support for his position Appellant cites several cases in which the court held that it was error to allow a police officer to testify regarding a co-defendant's confession. *See Nelson v. O'Neil,* 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971); *Commonwealth v. McDowell,* 460 Pa. 474, 333 A.2d 872 (1975); *Commonwealth v. Brady,* 741 A.2d 758, 766 (Pa.Super.1999).

The Commonwealth argues that Trooper Kopas's testimony merely indicated that the day following the murder the investigation focused on Appellant and Bair because they gave inconsistent accounts of how they spent their day. Because it was not admitted for the truth of the matter asserted, the Commonwealth argues that Trooper Kopas's testimony was not hearsay.

■ Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pa.R.E. 801(c). An out of court statement offered not for its truth but to explain the witness's course of conduct is not hearsay. *Commonwealth v. Sneed,* 514 Pa. 597, 526 A.2d 749 (1987) (holding that where a police officer related the contents of a radio call that prompted his trip to the crime scene, such

testimony was not hearsay because it was introduced solely to explain how the officer came to be at the scene). Here, Trooper Kopas testified regarding the substance of his conversation with Bair to explain its discrepancies with Appellant's account and to explain the justification for further investigating Bair and Appellant. Although the trial court arguably confused the jury by instructing them to consider the statement "for the truth of the statement," the trial court properly cleared up the confusion by clarifying that they should "consider it simply for the fact that Mr. Bair made the statement." N.T 6/14/2002 at 172. Therefore, not only was Trooper Kopas' reference to Bair's statement not hearsay, but to the extent the trial court confused the jury, it also cured any potential confusion.

Because this case did not involve hearsay, it is clearly distinguishable from those cases cited by Appellant regarding the reading of a co-defendant's confession implicating the defendant. In that distinct situation, the statement is offered for the truth of the matter asserted and is thus inadmissible, and, in addition, raises myriad confrontation clause issues. *See, e.g., McDowell,* 333 A.2d at 874 (finding that the police officer's testimony regarding the co-defendant's confession was inadmissible hearsay and that its admission violated the defendant's constitutional right of confrontation). No relief is warranted.

### VIII. Search of Appellant's jail cell

As previously noted, suspecting that Appellant possessed jury lists in his jail cell, the trial judge accompanied Appellant's counsel to Appellant's jail cell and waited outside of the cell while Appellant and his counsel reviewed files to determine whether Appellant possessed any jury lists. No evidence that Appellant possessed jury lists was uncovered.

Appellant argues that the trial judge improperly acted as an investigator for the Commonwealth by directing a search of Appellant's jail cell. In support of his argument Appellant cites numerous cases articulating the principle that judicial proceedings must be unbiased and avoid the appear-

ance of bias. *See, e.g., Commonwealth v. Myma,* 278 Pa. 505, 123 A. 486 (1924) ("[T]he practice of a judge entering into the trial of a case as an advocate is emphatically disapproved ... and that his undue interference, impatience, or participation in the examination of witnesses' may tend to prevent the proper and unbiased presentation of the case."); *Bell v. City of Philadelphia, Bd. of Pensions & Retirement,* 84 Pa.Cmwlth. 47, 478 A.2d 537 (1984).

The Commonwealth points out that Appellant does not articulate how he was prejudiced by the judge's actions because no evidence was uncovered in his jail cell. The Commonwealth further asserts that the judge was there out of a desire to protect the sanctity of the jury trial process and prevent Appellant from further manipulating it.

While we find the judge's trip to the jail cell unnecessary and unorthodox at best, we agree with the Commonwealth that Appellant cannot demonstrate that he was prejudiced by this action. The judge waited outside the cell while counsel and Appellant reviewed the files to determine whether they contained jury lists. Consequently, the judge did not talk to Appellant, rifle through his belongings, or even see the process employed by counsel and Appellant. Moreover, the jury was unaware of the judge's conduct. Upon counsel's averment that Appellant did not possess any jury lists, the trial judge took no further action. Under these particular circumstances we find that the judge's actions had no impact whatsoever on the trial, and, accordingly, Appellant was not prejudiced. The cases cited by Appellant stand for the proposition that when a judge improperly acts as advocate, and his actions have an undue effect on the judicial process, a defendant may be entitled to relief. In this case, the trial judge's actions had no material effect on the process. Therefore, this claim also fails.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant raises four claims of ineffective assistance of trial counsel. These claims are ripe for disposition because they were properly raised and preserved in the trial court, the trial

court held a hearing, and the court addressed the claims on the merits in its subsequent opinion. *See Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003), *cert. denied*, 540 U.S. 1115, 124 S.Ct. 1053, 157 L.Ed.2d 906 (2004).

To obtain relief on a claim of ineffective assistance of counsel, Appellant must show that there is merit to the underlying claim; that counsel had no reasonable basis for their course of conduct; and that there is a reasonable probability that but for the act or omission in question, the outcome of the proceeding would have been different. *Commonwealth v. Chmiel*, 585 Pa. 547, 889 A.2d 501, 540–41 (2005) (citing *Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261, 273–74 (2000); *Commonwealth v. Douglas*, 537 Pa. 588, 645 A.2d 226, 230 (1994); *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 974 (1987)). A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim. *Commonwealth v. Pierce*, 567 Pa. 186, 786 A.2d 203, 213 (2001). The burden of proving ineffectiveness rests with Appellant. *See Commonwealth v. Wilson*, 543 Pa. 429, 672 A.2d 293, 298 (1996). To sustain a claim of ineffectiveness, Appellant must prove that the strategy employed by trial counsel "was so unreasonable that no competent lawyer would have chosen that course of conduct." *Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251, 1265 (1994). Trial counsel will not be deemed ineffective for failing to pursue a meritless claim. *Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 304 (1999); *Commonwealth v. Rollins*, 525 Pa. 335, 580 A.2d 744, 748 (1990).

## IX. Consolidation

As noted, on December 20, 2000, the day before the Lauth murder, Appellant, Bair, Stan and Susan went to Morgan Jones's residence to steal a gun with which to commit robberies. At Jones' residence, Appellant distracted Jones while Bair stole the gun and concealed it until they left the property. The Commonwealth requested consolidation of the charges of theft of the handgun with the Lauth murder, which the trial court granted. Appellant now asserts that defense

counsel were ineffective for failing to object to the Commonwealth's motion to consolidate.

In dismissing this claim, the trial court pointed out that contrary to Appellant's assertions, trial counsel did object to consolidation. This conclusion is supported by the record, which belies Appellant's claim. In response to the Commonwealth's motion to consolidate, defense counsel filed an answer arguing that consolidation was improper because the gun theft and murder did not arise out of the same transaction or occurrence and the evidence of each would not be admissible in a separate trial for the other. *See* Defendant's Answer to Commonwealth's Motion for Consolidation at 2. At a hearing on the omnibus pretrial motion held January 31, 2002, Attorney English objected to the consolidation and argued against it. N.T., 1/31/2002, at 38–48. It was Attorney English's position that evidence surrounding the theft of the gun would not be admissible in a separate trial for murder. The trial court rejected this argument and permitted consolidation. Thus, contrary to Appellant's assertion, counsel did, in fact, object to the consolidation. Appellant does not demonstrate why the trial court was incorrect in this conclusion or otherwise shed light on his position that counsel did not object. Therefore, this claim fails.[13]

## X. *Voir dire*

During *voir dire*, the Commonwealth routinely asked each potential juror whether he or she would be able to impose the death penalty in an appropriate case. Trial counsel did not ask the jurors anything with regard to their ability to impose a life sentence. Appellant claims that trial counsel were ineffective for failing to life-qualify the jury (*i.e.*, ask the jurors whether they were able to follow the law of capital punishment and fairly consider a sentence of life imprisonment even after a conviction for intentional murder). *See Commonwealth v. Speight*, 578 Pa. 520, 854 A.2d 450, 459 (2004). This ineffectiveness is especially apparent, argues Appellant, be-

13. Appellant does not raise a claim of trial court error regarding the substantive decision to consolidate.

cause the Commonwealth was permitted to death-qualify the jury (*i.e.,* ask the jurors whether they would be able to follow the law of capital punishment and fairly consider imposition of the death penalty in an appropriate case), essentially ensuring a pro-death jury. *See Commonwealth v. Williams,* 586 Pa. 553, 896 A.2d 523 (2006). Appellant asserts that this failure cannot be part of a reasonable strategy, and that he was prejudiced as a result.

The Commonwealth responds in part that there is no support for Appellant's assertion that the Commonwealth ensured a "pro-death" jury. Rather, the Commonwealth points out that it simply questioned jurors regarding their ability to follow the law if the case warranted the death penalty. Further, the Commonwealth contends that although trial counsel is permitted to life-qualify the jury, counsel will not be deemed ineffective for failing to do so. *See Commonwealth v. Copenhefer,* 553 Pa. 285, 719 A.2d 242 (1998); *Commonwealth v. Hardcastle,* 549 Pa. 450, 701 A.2d 541, 543 (1997); *Commonwealth v. Blount,* 538 Pa. 156, 647 A.2d 199 (1994).

We agree with the Commonwealth that Appellant was not prejudiced by counsels' failure to life qualify the jury. *See Pierce,* 527 A.2d at 974. "Life-qualification" is the process by which prospective jurors are excluded from the jury based on their fixed opinion that the death penalty must be imposed for a first-degree murder conviction. *Speight,* 854 A.2d at 459; *Commonwealth v. Boxley,* 575 Pa. 611, 838 A.2d 608, 613 n. 2 (2003) (citing *Commonwealth v. Keaton,* 556 Pa. 442, 729 A.2d 529, 543 n. 9 (1999)); *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831, 846 (2003). Trial counsel is entitled to expansive *voir dire,* including the opportunity to life-qualify jurors. *See Boxley,* 838 A.2d at 614 (holding that "[i]n capital cases, the right to individual *voir dire* is mandatory, not discretionary, and cannot be limited in the interest of judicial economy."). It is well-settled, however, that although trial counsel is permitted to life-qualify the jury, such questions are not required and counsel is not *per se* ineffective for failing to pose them as long as the jury selection process is otherwise fair and impartial. *Speight,* 854 A.2d at 459; *Commonwealth*

*v. Rollins,* 558 Pa. 532, 738 A.2d 435, 441 (1999); *Commonwealth v. Hardcastle,* 549 Pa. 450, 701 A.2d 541 (1997).

Here, there is no allegation that trial counsel was prevented from asking questions about jurors' ability to impose a life sentence following a murder conviction. Rather, Appellant attacks counsels' decision not to do so, particularly in light of the Commonwealth's questioning regarding the jurors' ability to impose a death sentence. We recently addressed and rejected this same argument in *Speight,* 854 A.2d at 459, where we found that the appellant had not demonstrated prejudice as required to be entitled to relief on an ineffectiveness claim. *See Pierce,* 527 A.2d at 974. The appellant in that case argued that the jury selection process was not otherwise fair and impartial because the trial court "death qualified" all potential jurors. The result, argued the appellant, was that each empaneled juror was questioned about his or her ability to impose the death penalty but not about whether he or she was predisposed to imposing the death penalty instead of life imprisonment. *Id.* In rejecting this argument, we noted that appellant did not explain how the empaneled jurors were anything other than fair and impartial:

> The mere fact that counsel may not have posed the specific question as to whether a prospective juror would vote for a sentence of life imprisonment in an appropriate case does not justify the conclusion that counsel failed to assure that a fair and impartial jury was selected. Such a talismanic requirement would clearly place form above substance.

*Id.* (citing *Commonwealth v. Jermyn,* 516 Pa. 460, 533 A.2d 74, 87 (1987)). We therefore concluded that the appellant had not proven he was prejudiced in any way by trial counsel's failure to life-qualify jurors during *voir dire. Speight,* 854 A.2d at 459.

Similarly, Appellant has not demonstrated that he was prejudiced by counsel's failure to ask life-qualification questions. Although counsel did not life qualify the jurors, each juror underwent extensive questioning concerning his or her ability to follow the law and assured the trial court that he or she would be able to render a fair and impartial verdict and

sentence. We therefore reject this claim, because Appellant has failed to show that but for counsel's failure to life-qualify the jury, the outcome of the proceeding would have been different. *See Pierce*, 527 A.2d at 974.

## XI. Victim impact testimony

Next, Appellant argues that trial counsel was ineffective for failing to object to the content of the victim impact testimony of David Planker, the victim's brother. During the penalty phase Planker blamed the death of his mother, who had died from bronchitis two months following Lauth's murder, on Appellant, stating, "Whoever killed my brother also killed my mother, because they lived for each other." Planker further testified that because of the murder, his mother lost her home.[14]

Appellant launches several attacks against counsel in relation to Planker's testimony. First, he argues that counsel was ineffective for failing to object to this testimony, which was irrelevant hearsay that inflamed the passions of the jury. In support of this argument, Appellant relies on *Commonwealth v. McNeil*, 545 Pa. 42, 679 A.2d 1253 (1996), in which this Court found that testimony that the victim was gracious, kind, and generous was improper. Second, Appellant argues that counsel should have requested an instruction from the trial court to the effect that while victim impact testimony is admissible, it should not be considered as an aggravating circumstance. Finally, Appellant argues that trial court failed to charge the jury pursuant to 42 Pa.C.S. § 9711(c)(2), and counsel failed to object to this omission. Section 9711(c)(2) provides:

> The court shall instruct the jury that if it finds at least one aggravating circumstance and at least one mitigating circumstance, it shall consider, in weighing the aggravating

14. It appears that the substance of Planker's testimony regarded the close relationship between his mother and his brother, who lived together. This reference to his mother losing her home was followed by an explanation that the victim provided transportation and other assistance to his mother, so that when he was killed, she had to move in with her sister.

and mitigating circumstances, any evidence presented about the victim and about the impact of the murder on the victim's family. The court shall also instruct the jury on any other matter that may be just and proper under the circumstances.

42 Pa.C.S. § 9711(c)(2).

■ The Commonwealth responds that Planker did not in any way mislead the jury when he attributed his mother's death to bronchitis following the murder. The Commonwealth describes Planker's testimony as sentimental and pained, not unduly prejudicial; the sort one would expect from a man whose brother was murdered, and points out that *McNeil*, 545 Pa. 42, 679 A.2d 1253, was decided prior to the enactment of 42 Pa.C.S. § 9711(a)(2), which specifically authorized admission of victim impact testimony. Finally, the Commonwealth points out that the instruction discussed in 42 Pa.C.S. § 9711(c)(2) is clearly for the Commonwealth's benefit, and the trial court's failure to give it could not have prejudiced Appellant.

■ Victim impact evidence was inadmissible under the procedures established by the Sentencing Code, 42 Pa.C.S. § 9711, prior to its amendment on October 11, 1995. *McNeil*, 679 A.2d at 1259. In October, 1995, however, the legislature amended the statute to permit victim impact testimony. *See* 42 Pa.C.S. § 9711(a)(2). The victim of a crime may "(1) make a victim impact statement or present any victim impact information in relation to the sentence to be imposed on the defendant; or (2) testify as to the effect of the offense on the victim or the family of the victim." 42 Pa.C.S. § 9738. Victim impact testimony is defined as "evidence concerning the victim and the impact that that death of the victim has had on the family of the victim...." 42 Pa.C.S. § 9711(a)(2). Such testimony is permissible when the Commonwealth establishes that the victim's death had an impact on the victim's family as opposed to presenting mere generalizations of the effect of the death on the community at large. Once this threshold has been met, the trial court has discretion over the testimony

admitted. *Commonwealth v. Eichinger*, 591 Pa. 1, 915 A.2d 1122, 1139–40 (2007). *See also Commonwealth v. Williams*, 578 Pa. 504, 854 A.2d 440, 446 (2004).

Regarding Appellant's argument that counsel should have objected to Planker's testimony, we find Appellant's reliance on *McNeil*, 545 Pa. 42, 679 A.2d 1253, misplaced. The sentence in *McNeil* pre-dated the 1995 amendment to Section 9711. *McNeil*, 679 A.2d at 1259, n. 11. Planker's victim impact testimony was admissible under the version of 42 Pa.C.S. § 9711 in effect at the time of sentencing in this case, and counsel could not have been ineffective for failing to object to admissible testimony. *See Commonwealth v. Smith*, 544 Pa. 219, 675 A.2d 1221 (1996).

Second, Appellant attempts to construe Planker's testimony as having been offered as an aggravating circumstance for the jury's consideration, and asserts that trial counsel should have requested an instruction specifying that although it is admissible, it is not an aggravating circumstance. Although victim impact testimony is not listed among those factors the jury can consider as aggravating factors, *see* 42 Pa.C.S. § 9711(d), the evidence admitted at the sentencing phase is not limited to that necessary to establish mitigating and aggravating circumstances. *Commonwealth v. Means*, 565 Pa. 309, 773 A.2d 143, 153 (2001) (plurality). In *Means*, the trial court found that Sections 9711(a)(2) and (c)(2) violated the defendant's rights under both the United States and Pennsylvania Constitutions. This court reversed in an Opinion Announcing the Judgment of the Court ("OAJC") authored by Mr. Justice (now Mr. Chief Justice) Cappy. The OAJC rejected the defendant's argument that victim impact testimony amounts to an impermissible "arbitrary tiebreaker" and "super aggravating factor," ensuring that the jury would find in favor of death. *Means*, 773 A.2d at 161 (Zappala, J., dissenting). *See Commonwealth v. Taylor*, 583 Pa. 170, 876 A.2d 916, 934–35 (2005). After analyzing the rights involved, specifically the Eighth Amendment and Article 1, Section 13 of the Pennsylvania Constitution, the OAJC found that the stat-

ute permitting victim impact testimony did not violate the federal constitution or the Pennsylvania Constitution. *Means,* 773 A.2d at 157. Mr. Justice Saylor concurred in the result reached by the OAJC that the Sentencing Code provision permitting victim impact testimony is constitutional, thereby providing the fourth vote upholding the statute, but disagreed with the OAJC's constitutional analysis. *See Means,* 773 A.2d at 160. The OAJC further articulated a suggested "prototype jury instruction" for victim impact testimony. *Id.* at 158–59. Although *Means* did not achieve a majority consensus as to why Section 9711(c)(2) is constitutional, a majority of this Court has since consistently rejected challenges, similar to the general claim raised herein, that the statute is unconstitutional. *See Taylor,* 583 Pa. 170, 876 A.2d 916, 934–35; *Commonwealth v. Williams,* 578 Pa. 504, 854 A.2d 440, 446 (2004); *Commonwealth v. Harris,* 572 Pa. 489, 817 A.2d 1033, 1052 (2002); *Commonwealth v. Rice,* 568 Pa. 182, 795 A.2d 340, 352 (2002).

Here, although Appellant does not mention *Means* or the jury instruction suggested by the *Means* OAJC, he does argue that the jury was left without guidance regarding how to consider the victim impact testimony, and asserts that trial counsel should have ensured that the trial court clarify that the testimony was not a statutory aggravator. This argument is essentially the same as the general allegation attacking victim impact testimony as a "super aggravator" that, in the case law recited above, we have repeatedly rejected. Planker's testimony was not offered to support any of the enumerated aggravating factors found in 42 Pa.C.S. § 9711(d). In fact, the sentencing verdict slip shows that the only aggravators the jury considered were two of those specifically listed in Section 9711. *See* 42 Pa.C.S. §§ 9711(d)(6) and (9) (that Appellant had committed the murder while in the perpetration of a felony, and that he possessed a significant history of felony convictions involving the use or threat of violence). Rather, the testimony was offered to impress upon the jury the human effects of Appellant's crimes, which permissible under Section

9711(a)(2). Thus, Appellant's general attack on Section 9711(a)(2) must fail.

 Finally, regarding the 42 Pa.C.S. § 9711(c)(2) instruction, which requires the trial court to instruct the jury that if it finds at least one aggravating circumstance and at least one mitigating circumstance, it shall consider victim impact testimony, Appellant has not carried his burden to demonstrate that he was prejudiced by counsel's failure to request such an instruction. Although it does appear that Section 9711(c)(2) is mandatory, we fail to see how an instruction to consider the sympathetic testimony of the victim's brother could have benefited Appellant. Appellant's assertion that we do not know what the outcome would have been had the trial court included the instruction falls well short of his burden to demonstrate prejudice arising from counsels' omission. *See Pierce*, 515 Pa. 153, 527 A.2d 973.

## XII. Notice of victim impact testimony

 In a related argument, Appellant argues that the trial court abused its discretion by not requiring the Commonwealth to provide defense counsel with adequate notice of the witnesses it intended to call to provide victim impact testimony, "effectively thwarting any efforts by defense counsel to adequately prepare to combat the purported testimony." Appellant's Brief at 47. He asserts that the Commonwealth did not formally notify counsel of its intent to provide the testimony of Lauth's brother, Planker, until one hour before Planker testified. Although he phrases his argument in terms of trial counsel ineffectiveness, he neglects to discuss trial counsel's stewardship and focuses exclusively on the allegation of trial court error in failing to mandate Commonwealth's timely disclosure of victim impact witnesses. In support of his argument, Appellant relies on *Commonwealth v. Natividad,* 565 Pa. 348, 773 A.2d 167 (2001) (plurality) *abrogated on other grounds, Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385 (2003), in which three justices would have found that the better practice is to require notice of the intent to introduce victim impact testimony prior to trial.

The Commonwealth responds that *Natividad* does not mandate notice as Appellant asserts, for several reasons. First, *Natividad* was a plurality decision. Second, the Commonwealth notes that this Court never amended the Rules of Criminal Procedure to reflect a new judicially created rule, as requested by the defendant in *Natividad,* to the effect that notice of victim impact testimony and the nature thereof must be provided prior to trial. Finally, 42 Pa.C.S. § 9711, which regulates the sentencing hearing process, does not mandate pre-trial notice of victim impact testimony. For these reasons the Commonwealth asserts it was not obligated to provide notice prior to trial of its intent to present Planker's testimony, and defense counsel did not expect such notice.

In rejecting this claim, the trial court noted that *Natividad,* even if it did apply, merely requires pre-trial notice. At the hearing on post-trial motions, counsel testified that they were informally informed by the prosecutor on the day of jury selection of the Commonwealth's intention to have Planker testify during the penalty phase. Crediting this testimony, the trial court concluded that this notice, although not formal and not pre-trial, was timely, and that this testimony demonstrates that trial counsel were actually aware of the Commonwealth's intention to call Planker to provide victim impact testimony.

We likewise reject this claim because, assuming *arguendo* that counsel was entitled to formal pre-trial notice of who was going to testify, Appellant cannot demonstrate that he was prejudiced by the Commonwealth's failure to provide such notice or by counsel's failure to object to the testimony for this reason. Counsel testified that they were not surprised by Planker's testimony. Specifically, Attorney English testified that he was aware of "an extremely high likelihood" that the Commonwealth would present victim impact testimony in the penalty phase, regardless of the formal or informal notices Appellant received. N.T., 4/4/2005, at 46. Attorney English stated that he did not need anyone to tell him about the Commonwealth's intent to provide this testimony. *Id.* Specifi-

cally regarding Planker, Attorney English stated that he would have been stunned if he did not testify. *Id.*

Similarly, Attorney Elliott testified that both counsel knew that if there was a conviction, the Commonwealth would put members of the victim's family on the stand to testify about their loss. *Id.* at 259. Therefore, the Commonwealth's failure to provide formal notice at an earlier point before or during trial did not have any impact on counsel's knowledge that this testimony would be admitted. Accordingly, Appellant cannot demonstrate that the Commonwealth's failure adequately to notify counsel of its intention in this regard had any impact on counsel's preparation, or that counsel's failure to object to the admission of Planker's testimony for lack of notice, prejudiced him in any way. *See Pierce,* 515 Pa. 153, 527 A.2d 973.

## XIII. Mitigation

In Appellant's last issue, he argues that he should be awarded a new penalty phase hearing because trial counsel failed to prepare mitigation evidence and thereby provided ineffective assistance of counsel. Specifically, Appellant argues that counsel should have explored his school records; discovered childhood abuse at the hands of Appellant's father; discovered that Appellant was hard working despite cognitive impairments from Scarlet Fever as a child; and investigated how well Appellant had adapted to prison life. Moreover, Appellant asserts that had trial counsel properly investigated his criminal record they would have uncovered a pre-sentence report for a prior burglary, in which they would have discovered that Appellant had burglarized his family's restaurant and was sentenced to a boot camp program. Although the relevance of this is unclear, Appellant asserts that his acceptance to the boot camp program demonstrates his non-violent nature. Appellant acknowledges that he specifically directed counsel not to present mitigation evidence, but he argues that counsel should not have listened to his direction because he was suicidal at the time. Rather, Appellant asserts that trial counsel should have independently investigated these avenues of mitigation despite his direction to the contrary.

In support of his assertion that trial counsel should have conducted a more thorough investigation, at the post-trial motion hearing, appellate counsel presented the testimony of Dr. William Long, a clinical psychologist who reviewed Appellant's school records and the pre-sentence report from the prior burglary conviction. Dr. Long did not interview Appellant personally because Appellant refused to be interviewed. N.T., 4/4/2005, at 74. Based on his review of the school records and pre-sentence report, Dr. Long reached three conclusions. First, he concluded that Appellant may have suffered brain damage due to Scarlet Fever, which led to a temperature over 106 degrees when Appellant was six years old. He asserted that this diagnosis was consistent with Appellant's school records indicating developmental delays, difficulty learning, emotional issues, a tendency to engage in inappropriate behavior, and his need for special education. Second, Dr. Long concluded that brain-injured individuals generally may appear to be more intelligent that they really are. Third, Dr. Long concluded that Appellant's parents and upbringing may have contributed to his learning and behavioral difficulties.

In evaluating a claim that trial counsel was ineffective for failing to investigate and present mitigation evidence, it is settled that counsel has a general duty to conduct reasonable investigations or reach reasonable decisions that render particular investigations unnecessary. *Commonwealth v. Sneed*, 587 Pa. 318, 899 A.2d 1067 (2006). Moreover, our principal concern in deciding whether trial counsel exercised "reasonable professional judgment" is not whether counsel should have presented a mitigation case, but, rather, whether the investigation supporting counsel's decision not to introduce mitigating evidence of an appellant's background was itself reasonable. *Id., Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767, 784 (2004). Capital counsel have an obligation to pursue all reasonably available avenues for developing mitigation evidence. *Commonwealth v. Gorby*, 589 Pa. 364, 909 A.2d 775, 790 (2006) (citing *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529

U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). Strategic choices made following a less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of the investigation. *Commonwealth v. Bridges*, 584 Pa. 589, 886 A.2d 1127, 1132 (2005) (citing *Commonwealth v. Fears*, 575 Pa. 281, 836 A.2d 52, 72 (2003)). Our evaluation of counsel's performance is, however, highly deferential, and the reasonableness of counsel's decisions cannot be based upon the distorting effects of hindsight. *Id.* Furthermore, "reasonableness in this context depends, in critical part, upon the information supplied by the defendant." *Bridges*, 886 A.2d at 1132 (citing *Commonwealth v. Peterkin*, 511 Pa. 299, 513 A.2d 373, 383 (1986)).

To determine whether Attorneys English and Elliott were ineffective, we begin with a review of the investigation that counsel performed and the mitigation evidence presented at the penalty phase. *See Sneed*, 899 A.2d at 1079; *Fears*, 836 A.2d at 72. In preparation for the penalty phase of trial, counsel had several discussions with Appellant. Counsel's defense strategy in mitigation was to appeal to the jury's sentimentality and present Appellant "as a human being whose life had value and who had people who cared about him and loved him deeply and who had a family and two beautiful daughters that would miss him terribly if he was executed." N.T., 4/4/2005, at 115. When counsel discussed the mitigation defense with Appellant, he indicated a desire to kill himself if he was convicted, and expressed ambivalence about the penalty phase. *Id.* Despite this general ambivalence, Appellant was adamant about two things. First, Appellant did not want his counsel to attack his mother in any way and make her look like a bad parent. *Id.* at 117. Second, Appellant was against any kind of psychological testimony, and would not cooperate in this regard. *Id.* at 118, 155. After discussing their strategy with Appellant, counsel honored his wishes not to pursue any psychological evidence or evidence of his upbringing.

Pursuant to this strategy, they offered as mitigation witnesses Appellant's mother, wife, two daughters, and his wife's grandmother, each of whom portrayed Appellant positively.

Each witness consulted with Attorney English for the first and only time shortly before testifying. At the conclusion of the penalty phase, the jury found one mitigating factor—the catch-all mitigator based on the ages of Appellant's children. *See* 42 Pa.C.S. 9711(e)(8).

Considering the post-trial motion testimony and Appellant's arguments, the trial court concluded that trial counsel employed a reasonable defense strategy in deciding not to pursue an aggressive mitigation defense, and that they formed this strategy in consultation with Appellant. The trial court credited Attorney English's testimony and concluded that Appellant refused to cooperate with the gathering and presentation of psychological evidence and was unconcerned with, even opposed to, presenting mitigating evidence. Based on the post-trial testimony and the trial court's own off-the-record conversations with Appellant, it concluded that Appellant's waiver of counsel's mitigation investigation was made knowingly, intelligently, and voluntarily. Trial Ct. Op. at 50. Further, the trial court concluded that Appellant failed to meet his burden of demonstrating prejudice, *i.e.*, that the jury was likely to sentence him to life imprisonment, but for the limited mitigation evidence.

The record supports the trial court's conclusions. A review of the record, specifically, the post-trial testimony, demonstrates, first, that Appellant instructed trial counsel not to pursue a mitigation defense based on evidence regarding Appellant's mental health or abusive upbringing, and, second, that Appellant knowingly and voluntarily waived his right to have counsel present further mitigation evidence.

First, regarding Appellant's instruction to counsel not to pursue further mitigation based on psychological evidence or proof of an abusive childhood, it is undisputed that counsel did not obtain school records or hire a mitigation specialist, as Appellant now asserts they should have done. To explain the reason for the limited nature of their investigation, counsel testified that they were complying with Appellant's wishes, and, additionally, that their decision to attempt to portray Appellant as a good father and family man reflected their own

professional judgment based on strategic decisions and discussions with Appellant. Attorney English stated that Appellant had indicated that he was going to kill himself in prison and was thus ambivalent about the mitigation phase. *Id.* at 117, 214 ("[W]e were specifically told by [Appellant] that he wasn't concerned with presenting any mitigation evidence for a number of reasons."), 241–42 ("[Appellant] did not want us to pursue those areas of inquiry [regarding a mitigation defense.]"). Attorney Elliott further testified:

[D]uring our conversations with [Appellant] we explained that there were two types of proceedings here. One was going to be the guilt phase, and the second was going to be should there be a first degree murder conviction what we wanted to do with respect to attempting to avoid the death penalty. [Appellant's] basic comment to us made over and over again is "If I'm convicted of murder I don't care about the death penalty. I'm going to kill myself." We said [Appellant] if we're going to present mitigating evidence we have to be prepared beforehand, and his view was I'm not interested in that.

*Id.* at 266. In fact, when counsel discussed the possibility of approaching the prosecutor to negotiate a plea for life in prison following discovery of Appellant's attempt to tamper with the jury, Appellant stated "I don't care about a life sentence as opposed to a death sentence." *Id.*

Counsel specifically testified that Appellant was opposed to the idea of presenting psychological evidence and refused to submit to a psychological assessment. *Id.* at 117–18 ("[Appellant] was very much against the psychological testimony; wasn't going to cooperate with it, wasn't going to have anything to do with it, didn't think it was relevant."), 136 ("And given [Appellant's] feelings on the issue of psychologists it wasn't something that we were pursuing. . . . He didn't want to do a psychologist. . . . It was not anything that he wanted to do with it."), 155 ("[Appellant] was not interested in submitting himself to a psychological examination I believe under any scenario."). In fact, Dr. Long testified that Appellant still refused to be interviewed in conjunction with his assessment.

*Id.* at 74. Nor was Appellant interested in presenting any evidence that would cast his mother in a poor light or indicate that he was poorly parented. *Id.* at 117.

This testimony, which the trial court credited, demonstrates that Appellant decided not to present a more elaborate mitigation case and instructed his counsel to that end. Counsel honored Appellant's wishes in this regard. Appellant does not now deny that he directed his counsel not to pursue a mitigation defense or that he specifically told them he was not willing to cooperate with presenting psychological evidence or submitting to a psychological examination. Nor does he deny that he told them not to present evidence of his childhood in order to prevent his mother from looking bad. Rather, he argues that because he indicated a desire to commit suicide, counsel was ineffective in heeding his wishes. We must therefore address the second part of the trial court's conclusion—that Appellant waived further investigation and presentation of mitigation evidence.

In *Commonwealth v. Wilson,* 580 Pa. 439, 861 A.2d 919 (2004), we noted that certain jurisdictions require capital counsel to conduct an investigation into potential mitigation evidence to ensure that a defendant's waiver of such proof is knowing and intelligent. *See, e.g., Koon v. Dugger,* 619 So.2d 246, 250 (Fla.1993). Pennsylvania, however, aligns with those states that do not so require, demanding only that the defendant's waiver be knowing, intelligent, and voluntary. *Wilson,* 861 A.2d at 934. The *Wilson* Court considered counsel's testimony that he had discussed with the defendant the mitigating factors and the importance of contacting family members and presenting such evidence. Further, trial counsel and the trial court advised the defendant of his right to present mitigation evidence. Under those circumstances, we concluded that the defendant's waiver was knowing, intelligent, and voluntary, and that he did not establish "that his counsel rendered ineffective assistance in following his wishes respecting the investigation and presentation of mitigation evidence." *Wilson,* 861 A.2d at 934–35.

Appellant did not testify at the post-trial hearing. As noted, Attorneys English and Elliott did testify, and the trial court credited their testimony that Appellant made an informed decision not to present a more elaborate mitigation case and instructed his counsel to that end. Based on the testimony outlined above by Attorney Elliott that they had explained the whole trial process to Appellant, Appellant knew he was on trial for his life and would have the opportunity at sentencing to present a defense, and that he signaled his understanding of this process. N.T., 4/4/2005, at 246. Specifically, Attorney English testified that Appellant knew that trial was two phases and that after the guilt phase the defense would have the opportunity to convince the jury to spare his life. N.T., 4/4/2005, at 157–58. During their discussions, Appellant directed counsel to allocate their resources to the guilt phase because he was indifferent about the consequence of the penalty phase. *Id.* at 214. As a result of their consideration of options in the penalty phase and their discussion of these options with Appellant, Attorney Elliott testified that he knew there might be more evidence to support mitigation, but decided not to investigate it. *Id.* at 243. The trial court concluded that this decision flowed from his conversations with Appellant and Appellant's directions not to pursue mitigation. Trial Ct. op. at 50.

Based on the record and the trial court's conclusions crediting trial counsel's testimony, we agree that Appellant's waiver of the mitigation investigation was knowing, intelligent, and voluntary. Trial Ct. Op. at 50. *See, e.g., Wilson,* 580 Pa. 439, 861 A.2d 919; *Commonwealth v. Michael,* 755 A.2d 1274 (2000) (plurality) (declining to find counsel ineffective for failing to investigate potential mitigation defense because the defendant had waived the investigation, even though the trial court had ordered counsel to contact the defendant's family and friends and prepare a penalty phase defense). A review of the record supports the trial court's conclusion that trial counsels' defense strategy not to pursue an aggressive mitigation defense was reasonable and that counsel reasonably in-

vestigated mitigation evidence to the extent Appellant permitted them to do so.

Further demonstrating that trial counsel had a reasonable basis for not pursuing mitigation evidence that would have demonstrated Appellant's behavioral and cognitive difficulties, counsel credibly testified that even if they had known all of the evidence Appellant now asserts they should have uncovered, they would not have presented it because it contradicted the mitigation defense they chose to present. Attorney English testified that regarding their mitigation strategy, which, as described above, was focused on portraying Appellant as a loving family member who would be missed by his relatives, they would not have wanted to put on an aggressive mitigation defense that relied upon educational and social records revealing Appellant's prior misconduct. N.T., 4/4/2005, at 116–17. Regarding Dr. Long's testimony, Attorney English indicated that there was nothing in that testimony that would have changed his strategy at the sentencing hearing. *Id.* at 135–36. We therefore conclude that Appellant has not established that his counsel rendered ineffective assistance when they followed his wishes and declined to present mitigation that would have contradicted the mitigation defense actually presented. *See Wilson,* 861 A.2d at 935.

Having rejected all of Appellant's claims, we must affirm the sentence of death unless it was a product of passion, prejudice, or any other arbitrary factor. 42 Pa.C.S. § 9711(h)(3)(i). After carefully reviewing the trial record, we conclude that the sentence of death was not a product of passion, prejudice, or any other arbitrary factor, but was based upon the evidence admitted at trial. Further, this sentence complies with 42 Pa.C.S. § 9711(c)(1)(iv), which mandates a sentence of death when the factfinder finds one or more aggravating circumstances that outweigh any mitigating circumstances. Lastly, pursuant to 42 Pa.C.S. § 9711(h)(3)(ii), we find that the evidence was sufficient to support the aggravating circumstances the jury found when it imposed a sentence of death.

Accordingly, we affirm the verdict of first-degree murder and the sentence of death.[15]

Former Justice NEWMAN did not participate in the consideration or decision of this case.

Justice EAKIN and Justice BALDWIN join the opinion.

Chief Justice CAPPY files a concurring opinion.

Justice CASTILLE files a concurring opinion in which Justice SAYLOR joins.

Chief Justice CAPPY, concurring.

I join the majority opinion subject to similar concerns raised by Justice Castille in his concurring opinion regarding the scope of the *"Bomar*[1] exception"* to this court's decision in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002). I agree with Justice Castille that "we should examine more squarely the procedural question of whether and when criminal defendants ... should be afforded the post-verdict and direct appeal unitary review which occurred in *Bomar*." Concurring Opinion at 715, 933 A.2d at 1030 (Castille, J.). My fear is that continued employment of the *"Bomar* exception"* will eventually swallow the rule we announced in *Grant* governing the presentation of ineffectiveness claims.

Justice CASTILLE, concurring.

I join the Majority Opinion, with the exception of the two points I address below.

First, although this is a direct appeal, the Majority entertains and reviews appellant's four claims of ineffective assistance of trial counsel notwithstanding that, in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), this Court held, as a general rule, that claims of counsel ineffectiveness should be

15. The Prothonotary of the Supreme Court is directed to transmit a full and complete record of the trial, sentencing hearing, imposition of sentence, and the opinion and order of this Court to the Office of the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).

1. *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003).

deferred to collateral review under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546. The *Grant* Court abrogated the prior procedural rule represented by *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977), which had required new counsel to raise claims of previous counsel's ineffectiveness at the first opportunity after new counsel is appointed. *Grant*, 813 A.2d at 738.

The Majority reviews the instant claims under authority of *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003), *cert. denied*, 540 U.S. 1115, 124 S.Ct. 1053, 157 L.Ed.2d 906 (2004). *Bomar* was litigated in the trial court under the *Hubbard* rule. Bomar's trial counsel withdrew after sentencing and new counsel entered the matter and filed post-sentence motions, raising claims of ineffective assistance of counsel. The trial court conducted hearings at which trial counsel testified, and the trial court later wrote an opinion addressing the merits of the claims. In such a circumstance, the Bomar Court determined that the concerns which powered the rule in Grant were not implicated; the Court therefore reviewed the trial court's ineffectiveness rulings on the merits on direct appeal. *Id.* at 853–55; *see also Commonwealth v. O'Berg*, 584 Pa. 11, 880 A.2d 597, 600–01 (2005) (discussing Bomar). The case *sub judice* is not the first time we have followed the "*Bomar* exception" to *Grant*, and thus, there certainly is precedent supporting the Majority's determination to review these collateral claims. *See, e.g., Commonwealth v. Chmiel*, 585 Pa. 547, 889 A.2d 501 (2005), *cert. denied*, —— U.S. ——, 127 S.Ct. 101, 166 L.Ed.2d 82 (2006); *Commonwealth v. Singley*, 582 Pa. 5, 868 A.2d 403(Pa.), *cert. denied*, 546 U.S. 1021, 126 S.Ct. 663, 163 L.Ed.2d 536 (2005).

Nevertheless, given this Court's experience with *Grant*, with *Bomar*, and with other attempts to generate exceptions to *Grant*, I continue to believe that we should examine more squarely the procedural question of whether and when criminal defendants, upon demand, should be afforded the post-verdict and direct appeal unitary review which occurred in *Bomar*. In light of this Court's August 11, 1997, order suspending the Capital Unitary Review Act ("CURA"), 42

Pa.C.S. §§ 9570–79 (and provisions in the PCRA which referred to unitary review or to specific CURA provisions), a defendant afforded such hybrid direct review faces no existing impediment in the PCRA, the Criminal Rules, or the caselaw to pursuing a second round of collateral claims under the PCRA, after a first round of direct/unitary review concludes. Affording an advanced and additional layer of collateral attack to select defendants necessarily occasions delay in those cases. Moreover, in the absence of a procedural rule or other guidance from this Court, it is difficult to explain why certain defendants have been afforded two collateral attacks upon request, while others are not, but instead are consigned to the single collateral review statutorily authorized under the PCRA. As matters now stand, it is within the unconstrained discretion of the trial judge whether a defendant will get one or two bites at the collateral review apple. Furthermore, there is no statutory authorization for the redundant, of-right collateral attacks that result from hybrid direct appeal review.

I have outlined my concern in this regard previously in my Concurring Opinion in *O'Berg*, a case where this Court rejected a suggested "short-sentence exception" to *Grant's* recognition that ineffectiveness claims should be deferred to the collateral review stage. I noted that the *Bomar* Court's decision to review the hybrid claims there "did not purport to approve such a review paradigm prospectively, as a post-*Grant* matter. Rather, this Court merely took the *Hubbard*-era record as we found it in *Bomar*, and proceeded to determine if direct review, or a pointless deferral to PCRA review, of the collateral claims was appropriate." *O'Berg*, 880 A.2d at 603 (Castille, J., concurring). I addressed the difficulties in allowing for post-sentence litigation of collateral claims in light of the holding and rationale of *Grant*:

> Our present state of jurisprudence properly recognizes that claims of ineffective assistance of counsel are quintessentially collateral claims and that they are expressly cognizable under the PCRA. 42 Pa.C.S. § 9543(a)(2)(ii). Therefore, the PCRA, which is the "sole means of obtaining collateral relief" in Pennsylvania, unquestionably is the ap-

propriate repository for such claims, and our decision in *Grant* recognized as much. 42 Pa.C.S. § 9542; *Grant,* 813 A.2d at 734–38. . . .

\* \* \* \*

In light of the now-settled PCRA construct, I do not believe that this Court is remotely obliged to permit **any** criminal defendant—no sentence, short sentence, long sentence, capital sentence—to raise collateral claims, such as ineffective assistance of trial counsel, **as a matter of right** upon post-trial motions. One of the salutary, corrective, and visionary features of *Grant* was its recognition that direct and collateral review should be permitted to play the distinct and essential roles they are supposed to serve in the criminal justice system. The appropriate forum for litigating claims of ineffectiveness is under the PCRA. . . . It makes no more sense to torture post-trial practice to convert it into a quasi-PCRA role than it does to torture the direct appeal process to serve the same quasi-collateral function. Ineffective assistance of counsel claims, as a class, are no more important than other substantive constitutional claims deemed cognizable under the PCRA, such that they must be afforded an *ad hoc,* judicially-created, extra-PCRA forum. . . .

In my view, the jurisprudential underpinnings of *Grant,* the practical effect of the decision, and the requirements of the PCRA necessarily call for a careful reconsideration of post-trial practice. . . . Furthermore, I believe that any consideration of whether and when claims of ineffectiveness may appropriately be pursued upon post-trial motions must account for the proper role played by the PCRA, as well as the consequence that should follow upon a determination that a defendant will be permitted to advance his collateral claims and litigate them in some "unitary" post-trial proceeding and on direct appeal. For instance, it seems logical that, in a case where the defendant is serving a lengthy sentence, if the trial court is essentially asked to permit a defendant to compress collateral/PCRA review into his post-

trial motions and direct appeal, the cost of doing so should be an explicit waiver of the right to pursue a later petition as of right under the PCRA. The post-verdict process should not be allowed to become a vehicle by which a defendant secures a second round of collateral attack as of right, raising new claims of ineffective assistance, where the PCRA explicitly envisions a single collateral challenge, in the absence of the extraordinary circumstances governing serial petitions as set forth in 42 Pa.C.S. § 9545(b).

*Id.* at 605–06 (footnote omitted). I suggested a referral to the Criminal Procedural Rules Committee for a recommendation.

Further reflection and experience, including in this case, merely corroborates and strengthens my view that prolix ineffectiveness claims should not be entertained as of right on post-verdict or post-sentencing motions-unless, perhaps, the defendant expressly enters a record waiver of his of-right, first PCRA petition. Allowing pre-PCRA hybrid review raises questions of avoidable delay, abuse, arbitrariness, and avoidable complication.

This case well illustrates the delay inherent in permitting hybrid direct review. Trial counsel's post-trial motions were filed on July 8, 2002. The trial court's decision to grant appellant's subsequent request for new counsel, so that counsel could file new motions assailing trial counsel's performance, led to **three and one-half years of delay** in the disposition of this direct appeal. That delay might be tolerable, if the collateral review so conducted represented appellant's of-right PCRA. But since appellant presumably is free now to pursue a "first" PCRA petition as of right after this appeal, the delay serves no justifiable purpose.

The question of abuse is a function of the practical benefit to capital defendants of as many rounds of review as possible, and as much attending delay as possible. As I have noted elsewhere:

In capital cases, of course, delay is often an end in itself for the death-sentenced prisoner. As Chief Justice Rehnquist has noted, there are "different litigating incentives

facing capital and noncapital defendants." *Lindh v. Murphy,* 521 U.S. 320, 340, 117 S.Ct. 2059, 2070, 138 L.Ed.2d 481 (1997) (Rehnquist, C.J., dissenting).

> Noncapital defendants, serving criminal sentences in prison, file habeas petitions seeking to be released, presumably as soon as possible. They have no incentive to delay.... In contrast, capital defendants, facing impending execution, seek to avoid being executed. Their incentive, therefore, is to utilize every means possible to delay the carrying out of their sentence.

*Id.* I would be careful not to create any incentive for a capital defendant to build delay into his appeal. *Commonwealth v. Michael,* 562 Pa. 356, 755 A.2d 1274, 1284 (2000) (Castille, J., concurring) (omission in original). Every day of litigation delay, in a capital case, is another day of deferring the date with the announced penalty. Savvy or politically-attuned capital defense practitioners undoubtedly will deem it their obligation to invoke *Bomar* and thereby insure an extra round of review and delay.

The question of arbitrariness arises because there are no existing standards or guidelines governing when a trial judge should permit litigation of ineffectiveness claims, or other collateral claims, on post-verdict review or should defer to review at the collateral stage. Even those judges who entertain such claims may fail to hold an evidentiary hearing, thereby impeding review and failing to satisfy *Bomar.* Other judges may allow for review of select collateral claims, but not others. It is impossible to imagine a workable discretionary rule which allows some defendants a full, pre-PCRA collateral attack in the direct appeal context, and confines others to preserved claims. Given the existence of the PCRA as the presumptive repository for collateral claims, the general rule should be that the defendant **cannot** expand post-verdict motions and direct appeal to encompass collateral claims (at least, absent an agreement to waive his PCRA rights). There may be certain fundamental, albeit collateral complaints (such as a relevant new and retroactive rule of constitutional law) that require immediate vindication. But, post-verdict motions

should not become an accepted repository for laundry lists of collateral-appropriate complaints, with concomitant delay, such as occurred here—all in advance of a second round of statutorily-authorized collateral attack via the PCRA as of right.

The question of avoidable complication is an inevitable byproduct of entertaining ineffectiveness claims in advance of PCRA review. In a case such as this one and *Bomar*, when the defendant finally proceeds to PCRA review, he will have to couch his claims in terms of layered counsel ineffectiveness, *i.e.*, claiming that post-verdict/direct appeal counsel was ineffective for failing to raise different and additional claims of ineffective assistance of trial counsel. The question of how properly to approach such "layered" ineffectiveness claims caused such difficulties that this Court found it necessary to devise an appropriate protocol in *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014 (2003). Nor has this Court fully come to terms with the standard for reviewing claims sounding in the ineffectiveness of appellate and/or collateral counsel. Such complications disappear, or at least are severely minimized, if we devise and enforce a rational scheme consisting of a single direct review of preserved claims, followed by one collateral attack as of right.

I have no objection to a form of unitary review taking place on post-verdict motions and direct appeal. Some defendants seek not delay, but immediate vindication of a clear claim. But any such unitary review should be a substitute for, and not an advance supplement to, PCRA review. A single and binding, unitary review procedure is certainly what the General Assembly envisioned for capital cases when it enacted CURA in 1995. This Court suspended that sweeping legislation because it invaded our exclusive procedural rule-making authority under the Pennsylvania Constitution. *See In Re Suspension of Capital Unitary Review Act*, 554 Pa. 625, 722 A.2d 676 (1999) (explaining suspension of CURA). But that action, premised upon existing conflict between the statute and the Criminal Rules, does not act as a bar to this Court considering the advisability of altering our Criminal Rules to allow for unitary review and, of course, that consideration can

look to the intent, purpose, and wisdom of the CURA model. We have also seen modifications in the review of direct capital appeals and in PCRA review generally, including *Grant* (which applies to all criminal cases) and the elimination of the discretionary relaxed waiver doctrine (exclusive to capital cases). Also, in the time since we suspended CURA, this Court has seen firsthand the seemingly interminable delay that still exists in capital review in Pennsylvania, notwithstanding our attempts to streamline matters. It is time for the Court to take up the mantle and address, through our rule-making authority, the advisability of adopting a procedure by which unitary review may be achieved in an appropriate case. Accordingly, I would refer this matter to the Criminal Procedural Rules Committee to consider the unitary review legislatively contemplated in CURA, and to suggest whether and how a similar procedure could be achieved, in an appropriate instance, via rulemaking. As part of the referral, I would have the Committee consider whether, as a corollary to adopting appropriate changes or additions to the existing rules, it would be necessary or proper to lift the suspension of any of the CURA provisions currently under suspension.

Pending the result of that referral, however, I would take this opportunity to disapprove of trial courts entertaining prolix collateral claims on post-verdict motions, absent a concomitant waiver of PCRA review. Thus, if left to my own devices, because appellant did not waive his PCRA rights, I would defer consideration of all of appellant's ineffectiveness claims to PCRA review.

My second area of concern involves the Majority's disposition of appellant's claim that trial counsel were ineffective in failing to investigate, prepare and present a fuller and better penalty phase case in mitigation. As the Majority notes, the record supports the trial court's conclusions that appellant: (1) instructed trial counsel not to pursue a mitigation defense based on his mental health and abusive upbringing; and (2) knowingly and voluntarily waived his right to have counsel present further mitigation evidence. Majority Op. at 708–11, 933 A.2d at 1026–27. These twin findings are all that is

necessary to decide this claim of ineffective assistance, as it is posed on this appeal, and particularly in light of recent authority from the U.S. Supreme Court.

In *Schriro v. Landrigan*, —— U.S. ——, ——, 127 S.Ct. 1933, 1941, 167 L.Ed.2d 836 (2007), the High Court observed that, where a capital client instructs his counsel not to offer mitigating evidence, "counsel's failure to investigate [mitigation evidence] further could not have been prejudicial under *Strickland*." [1] In this case, appellant does not dispute that counsel acted in accordance with his express wishes respecting mitigation evidence. As a matter of law, counsel were not ineffective in acceding to their client's wishes, and the inquiry should end there.

Of course, a defendant theoretically could seek to attack the reasonableness of his attorneys' decision to abide by his directive respecting mitigation evidence-say, for example, by claiming that counsel knew or should have known that the defendant's directive to waive certain mitigation was not knowing and intelligent. *But see Schriro*, —— U.S. at ——, 127 S.Ct. at 1942 ("We have never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence."); *id.* at 1943 ("[W]e have never required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence."). At one point in his argument, appellant offhandedly adverts to such a claim, complaining that counsel supposedly "allowed themselves to be directed by their client who was suicidal at the time; a person who could not knowingly and intelligently waive this right." Appellant's Brief at 52. However, this theory was not the gravamen of appellant's complaint below, and he does not develop it here beyond the boilerplate declaration quoted. Allegedly suicidal persons are not, by that status alone, rendered incapable as a matter of law of waiving the presentation of evidence. Thus, I would not pass upon the cognizability or merits of this distinct, theoretical claim. *See Schriro, supra.*

1. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The law, by necessity, presumes competence and free will. Appellant was empowered to direct his counsel not to pursue mitigation evidence, either wholly or in part, and there is nothing inherently unreasonable in a lawyer abiding by his client's decision in that regard. Because no preserved and cognizable claim is presented challenging the validity of appellant's directive to his counsel, which is what caused his waiver of the opportunity to present other evidence of alleged mitigation, appellant's current claim of ineffectiveness necessarily fails. The absence of this mitigation evidence was appellant's own choice, and not the fault of his counsel.

Subject to the two points of concern I have articulated above, I join the Majority Opinion.

Justice SAYLOR joins this concurring opinion.