J-S04018-25

2025 PA Super 145

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
v.   :
  :
  :
  :
JAHROD KEARNEY   :
  :
Appellant   :   No. 1309 EDA 2024

Appeal from the Judgment of Sentence Entered November 9, 2023
In the Court of Common Pleas of Northampton County
Criminal Division at No: CP-48-CR-0000384-2022

BEFORE: OLSON, J., STABILE, J., and FORD ELLIOTT, P.J.E.[*]

OPINION BY STABILE, J.:          **FILED JULY 14, 2025**

Appellant, Jahrod Kearney, appeals from the judgment of sentence imposed on November 9, 2023, by the Court of Common Pleas of Northampton County, made final by the denial of his post sentence motion on February 21, 2024.[1] On appeal, he challenges evidentiary rulings by the trial court.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Defense counsel filed a timely notice of appeal from the judgment of sentence on March 19, 2024, and was docketed at 1068 EDA 2024. Thereafter, counsel filed to withdraw, which was denied on April 11, 2024. Appellant filed a *pro se* notice of appeal the denial of counsel's request to withdraw on May 6, 2024, and was docketed at 1309 EDA 2024.

Appellant then filed a *pro se* application for relief on both dockets, requesting removal of his counsel. At 1309 EDA 2024, this Court denied relief and directed counsel to address the issue in the appellate brief. At 1068 EDA 2024, this Court denied relief *in light of* the order entered in 1309 EDA 2024. We believe this language implicitly directed the parties to file their appellate briefs at 1309 EDA 2024. As such, all issues relative to the judgment of sentence and counsel's request to withdraw were filed at 1309 EDA 2024, and 1068 EDA 2024 was ultimately dismissed for failure to file a brief.

Additionally, Appellant's counsel challenges the denial of his request to withdraw from the case. Upon review, we affirm.

Following a multi-day jury trial, Appellant was convicted of first-degree murder. The jury found that on June 18, 2020, Appellant fatally shot the victim, Ricky Hunter. The Commonwealth witness Darema Exum, who was in a physical relationship and resided with Appellant at the time of the murder, testified as follows:

> On the evening of June 18, 2020, Appellant, who was acting "nervous" and "anxious" and pacing in their residence, told [Exum] that Hunter was a confidential informant and that he "was going to get rid of [him.]" Appellant relayed to Ms. Exum that he was upset and angry because a month prior, an individual, named "Edgar Lopez," was arrested because Hunter "told on [him]."
>
> Ms. Exum further testified that she overheard Appellant talking to someone on the phone, arranging for the person to provide an "Uber" and that Appellant would meet them at the destination. She stated that she then observed Appellant get into his black rental car and drive away after retrieving his 9 millimeter firearm. Prior to leaving, Appellant told Ms. Exum that he was going to "deal with [Hunter]."
>
> Ms. Exum testified that approximately one to two hours later, Appellant returned to their home appearing "relieved" and "still kind of anxious," wearing the same clothes he had on when he left her home previously, but there were blood spatters on his shirt, pants, and shoes. Ms. Exum testified that upon Appellant's return to her residence, Appellant explained to her that he killed Hunter. Specifically, Appellant told Ms. Exum that he got in Hunter's car and used Hunter's bandana to put his head up to the window, at which point Hunter asked Appellant not to kill him. He further relayed to Ms. Exum that he waited for firecrackers to go off before he shot [Hunter].
>
> Ms. Exum further testified that Appellant did not have the 9 millimeter gun when he returned to her residence. Appellant told

- 2 -

Ms. Exum that he dropped the gun off at a friend's house. When Ms. Exum expressed concern about the presence of the gun, Appellant told her to dispose of it herself. Ms. Exum testified that she drove to the address Appellant provided to her regarding the location of the gun, and after she located and retrieved the gun, she returned to her residence. At that time, Appellant told Ms. Exum that that was the gun he used to kill Hunter and that if she was afraid of the gun being in her home, then she had to get rid of it. Ms. Exum testified that she eventually sold the gun. Ms. Exum further testified that in the days following the shooting, Appellant continued to act paranoid, constantly checking the news and news articles to see if the police had any news leads with respect to the shooting.

Trial Court Opinion, 5/17/24, at 26-27 (citations to record omitted). Exum did not inform police that she had information relevant to the murder until April 2021. N.T. Trial, 10/4/23, at 544. She explained that even though she was afraid of Appellant, she decided to come forward after seeing how hurt and distraught Hunter's brother was by the unsolved murder. *Id.* at 544-545, 553.

The case proceeded to a grand jury in which Exum testified on two occasions – May 5 and 12, 2021. *Id.* at 550. She was granted immunity before testifying the second time.[2] *Id.* Exum provided extensive testimony regarding her fear of Appellant, how that led to her delay in reporting what she knew to the police and why she disposed of the gun for Appellant. *Id.* at 648. Specifically, she testified that she witnessed Appellant assault and torture a man in her basement. *Id.* at 649-50. The man who was tortured

_____

[2] Police confronted Exum with their belief that she sold the gun. N.T. Trial, 10/4/23, at 568. In exchange for immunity, Exum provided police with information about the gun's sale. *Id.*

had previously fired gunshots at Exum's residence. *Id.* Appellant found out who that person was and brought him back to the residence he shared with Exum. The person was taken to the basement, and Exum watched Appellant torture him there. *Id.* Later, after the murder of Ricky Hunter, Appellant told Exum to dispose of the gun because "she owed him a favor." *Id.* at 649.

Additionally, Exum testified in front of the grand jury that she received information that Appellant had "put a $10,000 hit on her." *Id.* Exum told Detective Benjamin Mastrofilippo this information, and that she was being told to "lay low" by friends and family. *Id.* at 654.

The Commonwealth did not later introduce this testimony during its case-in-chief at trial. However, during cross-examination, Exum was questioned extensively as to why she delayed reporting what she knew about Ricky Hunter's murder, why she helped Appellant dispose of the gun and whether she was truly afraid of Appellant. The Commonwealth argued, and the trial court agreed, that this line of questioning opened the door for the Commonwealth to introduce specific information as to why Exum disposed of the gun and delayed reporting the incident to the police. *See id.* at 657-59. Defense counsel requested a mistrial based on the court's ruling, which was denied. *Id.* at 659. Appellant was ultimately convicted of first-degree murder and sentenced to life imprisonment.[3]

---

[3] Appellant's first jury trial resulted in a mistrial. This appeal stems from Appellant's conviction following a retrial.

Appellant was represented by private counsel at trial. After sentencing, counsel was granted permission to withdraw and Matthew J. Deschler, Esquire, was appointed for purposes of appeal. Appellant filed a post-sentence motion, which was denied by the trial court. This timely appeal followed. On March 21, 2024, the trial court directed Appellant to file a 1925(b) statement of matters complained of on appeal ("1925(b) statement") within 21 days. On April 3, 2024, Attorney Deschler filed a motion to withdraw, stating that he informed Appellant that he had previously represented a Commonwealth witness, Kajun Knox, in an unrelated matter during the pendency of Appellant's case. As a result, Appellant did not want Attorney Deschler to represent him. Attorney Deschler also requested an extension of time to file the 1925(b) statement if substitute counsel was appointed. Following a hearing on April 8, 2024, the trial court denied the request to withdraw as well as the motion for an extension of time to file a 1925(b) statement.

On April 11, 2024, Appellant filed his 1925(b) statement. Thereafter, Appellant requested leave to amend his 1925(b) statement to include a claim regarding the denial of his motion to withdraw. The trial court granted the request, and Appellant filed an amended 1925(b) statement.[4]

_____

[4] Appellant also filed a *pro se* notice of appeal from the order denying counsel's motion to withdraw, along with an application for relief stating that Attorney Deschler "cannot represent [his] interests due to the most obvious conflict of interest between us." Application for Relief, 6/25/24. This Court denied Appellant's *pro se* request and directed Attorney Deschler to present the issue in the appellate brief. **See** Order, 6/20/24.

Appellant now raises the following issues for our review, renumbered for ease of disposition:

1. Did the trial court err and/or abuse its discretion when it permitted Darema Exum to testify about prior bad acts of Appellant[,] . . . specifically the alleged bounty on Darema Exum and the torturing/assaulting of an individual in a basement?

2. Did the trial court err and/or abuse its discretion when it denied Appellant's motion for a mistrial on October 4, 2023?

3. Did the trial court err and/or abuse its discretion when it sustained the Commonwealth's objection to Appellant impeaching the testimony of Kajuan Knox with Knox's conviction for violation of 18 Pa.C.S.A. § 6117 [(altering or obliterating marks of identification)], given that the offense was properly considered *crimen falsi*?

4. Did the trial court err and/or abuse its discretion when, on April 8, 2024, it denied [defense counsel's] motion to withdraw as counsel for Appellant?

Appellant's Brief, at 4.

We will address Appellant's first two issues together as they are interrelated. Appellant claims that the trial court abused its discretion by allowing the Commonwealth to elicit testimony from Exum regarding (1) the assault/torture of a man in their basement, and (2) the alleged bounty that Appellant placed on Exum. *Id.* at 9-10. He claims such testimony was evidence of Appellant's prior bad acts, admitted in violation of Pa.R.E. 404(b). *Id.* Further, he contends that the trial court erred when it denied his request for a mistrial based on the erroneous admission of such evidence. *Id.* at 13.

- 6 -

It is well settled that evidentiary rulings are within the sound discretion of the trial court. **Commonwealth v. DiStefano**, 265 A.3d 290, 297 (Pa. 2021). A trial court's ruling on the admissibility of evidence will only be reversed where there has been an abuse of discretion:

> An appellate court will not find an abuse of discretion based on a mere error of judgment, but rather . . . where the [trial] court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.

**Id.** at 298 (internal citation and quotation marks omitted). Evidence is generally admissible if it is relevant. Pa.R.E. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401.

"Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). To be admissible, the probative value of the evidence must outweigh its potential for unfair prejudice. **Id.**

The Commonwealth did not introduce any Rule 404(b) testimony during its case-in-chief. On cross-examination, defense counsel asked Exum several

questions regarding: (1) the inconsistent testimony about her knowledge of the gun used in the murder of Ricky Hunter[5], **see** N.T. Trial, 10/2/23, at 566-71, 610-13, 641-42; (2) whether the police tried to corroborate her testimony, **see id.** at 571-73, 575-79; (3) the persons to whom she sold the gun, how the sales were arranged, and whether the police attempted to corroborate her information[6], **see id.** at 579-92; (4) her motive to report Appellant to police, *i.e.*, that he stopped paying her rent, **see id.** at 593-99; and (5) whether she recorded Appellant's admission to the crime, **see id.** at 616-18. Exum was also questioned about her delay in reporting the murder:

Q:     And you will agree with me that it was March of 2021 or April of 2021 that you decided to go to the police, correct?

A:     Yes.

Q:     And this is for a crime that occurred on [June] 18, 2020, correct?

_____

[5] Exum initially testified in front of the grand jury that she did not know what happened to the gun after the murder. After she was given immunity, however, she testified that she had disposed of the weapon herself. At the preliminary hearing Exum was asked if she knew where the gun was currently, and she did not.

[6] Exum testified that after she retrieved the gun from where Appellant hid it, she sold it to an individual named "Deo" through Facebook for $500 and gave Appellant those proceeds. N.T. Trial 10/2/23, at 542-43. Deo then sold the gun to an individual nicknamed "PLB," who claimed the weapon's firing pin was broken. **Id.** at 582-83. That caused a dispute between Deo and PLB, which was settled when an individual nicknamed "Dolo" (later identified as Exum's brother) purchased the gun and fixed the firing pin. **Id.** at 583-85. Dolo then sold the gun to an individual nicknamed "China." **Id.** at 588-89. Exum did not know what happened to the weapon after that point. **Id.** at 591.

A:      Yes.

                         * * * *

Q:      So you sat with this vital information for a rather long period of time before you decided to report it to the police, correct?

A:      Yes, I told – I reached out to the detective because [Appellant] was threatening me and I was scared.

Q:      That's not what I asked you.  I said, that's when you reached out to the police?

A:      Yes.

Q:      So the month of July of 2020, the month of August of 2020, going forward, you never contacted police to say anything about what you claim you know, right?

A:      I did not reach out to police because he was still around and at my house and knew where I was located.  So I did not want to reach out to the police until I moved.

Q:      Okay.  So you wait until you move and you reach out to the police, correct?

A:      Yes.

Q:      And at this point, you and [Appellant] are no longer together fair?

A:      We were still conversating.

Q:      I know that because you sent him a text.  We will get to that.  My question is for now: At that time, you were not together, living together or socializing together in person, correct?

A:      Yes.

*Id.* at 599-601.

The Commonwealth argued, and the trial court agreed, that counsel's questioning opened the door for the 404(b) evidence to explain Exum's state of mind, her reasons for the delayed reporting and to explain why she disposed of the gun for Appellant. However, the trial court limited the Commonwealth to pointed, general questions about Exum owing Appellant a favor for the assault/torture of a man in their basement and Exum's knowledge that Appellant would pay someone $10,000 to kill her. The trial court also gave a limiting instruction prior to Exum's redirect examination:

> Members of the Jury, you may hear evidence tending to prove that [Appellant] was involved in conduct for which he is not on trial. This evidence may come before you for a limited purpose. That is for the purpose of allowing a witness to expand upon testimony previously given and to explain her state of mind.
>
> This evidence must not be considered by you in any way other than for the purpose I just stated. You must not regard this evidence as showing that [Appellant] is a person of bad character or criminal tendencies, from which you might be inclined to infer guilt.

*Id.* at 665-66. The Commonwealth then elicited the following testimony from Exum:

Q:    Darema, you [] already told this jury on numerous occasions that you were afraid of [Appellant]?

A:    Yes.

Q:    Okay. Was there ever a time that you personally observed [Appellant] assault somebody – do not give us the details of the assault, but did you ever personally observe [Appellant] assault somebody in your basement, after your house got shot up?

A:    Answer?

- 10 -

Q:     Yes.

A:     Yes.

Q:     Okay.  Did that have any bearing on the reason why you delayed reporting this crime?

A:     Yes.

Q:     Now, did there come a time when you became aware that a hit has [been] put on you personally?

A:     Yes.

Q:     Okay.  And what did you understand that hit to be?

A:     Basically – I don't really want to – okay.  Can you just give me a couple seconds.  I am trying to place this in the right words.  Basically, like, someone would get paid to basically kill me.

Q:     Okay. So you understand and you have heard that someone has been paid to kill you?

A:     Whoever does it will get paid.

Q:     Sure.  How much were they going to get?

A:     $10,000.

Q:     Okay.  And who put the hit on you?

A:     [Appellant].

Q:     To your knowledge, does that still exist?

A:     I would say so, yes.  I mean, $10,000 is a lot to some people.

Q:     Okay.  Of course.  Did that have any bearing on the delay in reporting [Appellant]'s crimes?

A:     Yes.

* * * *

Q:     Did the fact that you know that [Appellant] killed Ricky
       Hunter for being a confidential informant, did that have any
       bearing on your delay coming forward?

A:     Yes.

*Id.* at 669-71.

"A litigant opens the door to inadmissible evidence by presenting proof that creates a false impression refuted by the otherwise prohibited evidence." **Commonwealth v. Nypaver**, 69 A.3d 708, 716 (Pa. Super. 2013). "The phrase 'opening the door' . . . by cross examination involves a waiver. If defendant delves into what would be objectionable testimony on the part of the Commonwealth, then the Commonwealth can probe further into the objectionable area." **Commonwealth v. Lewis**, 885 A.2d 51, 54-55 (Pa. Super. 2005), *appeal denied*, 906 A.2d 540 (Pa. 2006) (citation omitted).

We discern no abuse of discretion in this case. Appellant, through cross-examination, suggested to the jury that Exum was more involved in the murder than her testimony indicated, and that she had a motive to lie about Appellant's involvement in the murder of Ricky Hunter. This opened the door for the Commonwealth to rehabilitate Exum by explaining why she waited so long to report Appellant's crimes, *i.e.*, that she was afraid of Appellant due to his prior bad acts in the torture of another person.

Evidence of a defendant's prior bad act is admissible to establish that fear of retaliation caused a witness to delay the reporting of the defendant's

crimes. *See Commonwealth v. Cook*, 952 A.2d 594, 620-21 (Pa. 2008) (evidence of defendant's prior bad acts was relevant and admissible to show why the witnesses delayed reporting); *Commonwealth v. Gonzalez*, 112 A.3d 1232, 1238 (Pa. Super. 2015) (same). Further, the trial court minimized any prejudicial impact of prior bad act evidence by limiting Exum's testimony to specific, pointed questions, and by providing a cautionary/limiting instruction to the jury.[7] Accordingly, the trial court's admission of prior bad evidence did not constitute an abuse of discretion, and there is no merit to Appellant's first claim.

In Appellant's second claim, he contends that the trial court erred by denying his request for a mistrial based upon the above-discussed admission of prior bad act evidence. *See* Appellant's Brief at 13.

Mistrials are governed by Pennsylvania Rule of Criminal Procedure 605, which states: "When an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial; the motion shall be made when the event is disclosed. Otherwise, the trial judge may declare a mistrial only for reasons of manifest necessity." Pa.R.Crim.P. 605(B). We review a trial court's denial of a mistrial for abuse of discretion:

> The trial court is in the best position to assess the effect of an allegedly prejudicial statement on the jury, and as such, the grant

---

[7] "If the trial judge gives curative [or cautionary] instructions, it is presumed that the jury will follow the instructions of the court." *Commonwealth v. Storey*, 167 A.3d 750, 758 (Pa. Super. 2017), *appeal denied*, 217 A.3d 1213 (Pa. 2019) (citation and quotation marks omitted).

or denial of a mistrial will not be overturned absent an abuse of discretion. A mistrial may be granted only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict. Likewise, a mistrial is not necessary where cautionary instructions are adequate to overcome any possible prejudice.

*Commonwealth v. Rega*, 933 A.2d 997, 1016 (Pa. 2007).

For the reasons set forth above, Appellant's second claim lacks merit. Appellant opened the door to the admission of the Rule 404(b) evidence at issue during his cross-examination of Exum. The trial court minimized any undue prejudice by limiting the Commonwealth's questions and providing a limiting instruction to the jury which comported with Rule 404(b). Thus, we conclude that the trial court did not abuse its discretion when it denied Appellant's request for a mistrial.

Appellant's third issue is that the trial court abused its discretion by not permitting Appellant to impeach the Commonwealth witness, Kajuan Knox, with a *crimen falsi* conviction. *See* Appellant's Brief, at 10-12. Knox was incarcerated at the time of his testimony and appeared in court wearing a prison-issued jumpsuit. N.T. Trial 10/5/23, at 847. He testified that he was currently serving a sentence for aggravated assault and robbery, and that he also had a prior conviction for receiving stolen property. *Id.* at 847-48. Knox provided extensive testimony regarding his knowledge of Appellant's involvement in the murder of Ricky Hunter.

On cross-examination, while questioning Knox about his criminal record, defense counsel attempted to elicit testimony of his 2015 conviction for altering or obliterating marks of identification, in violation of 18 Pa.C.S.A. § 6117(a). ***See id.*** at 953. The Commonwealth objected. Following a lengthy sidebar discussion and brief testimony by Knox outside the presence of the jury, the trial court sustained the Commonwealth's objection and prohibited defense counsel from questioning Knox about his 2015 conviction. ***See id.*** at 953-86.

It is well settled that evidentiary rulings are within the sound discretion of the trial court. ***Commonwealth v. DiStefano***, 265 A.3d 290, 297 (Pa. 2021). A trial court's ruling on the admissibility of evidence will only be reversed where there has been an abuse of discretion. ***Id.*** at 298. The impeachment of a witness by evidence of a prior conviction is governed by Pennsylvania Rule of Evidence 609, which provides:

> For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or *nolo contendere*, must be admitted if it involved dishonesty or false statement.

Pa.R.E. 609(a). Crimes involving dishonesty and false statement are commonly referred to as *crimen falsi* crimes. ***Commonwealth v. Washington***, 269 A.3d 1255, 1264 (Pa. Super. 2022), *appeal denied*, 283 A.3d 1249 (Pa. 2022). When deciding whether a crime is *crimen falsi*,

> we initially examine the essential elements of the offense to determine if the crime is inherently *crimen falsi*—whether

> dishonesty or false statement are a necessary prerequisite to commission of the crime.
>
> If the crime is not inherently *crimen falsi*, this Court then inspects the underlying facts that led to the conviction to determine if dishonesty or false statement facilitated the commission of the crime. The burden of proof is upon the party offering the conviction during cross-examination.

*Id.* at 1264-65.

Section 6117(a) provides, "No person shall change, alter, remove, or obliterate the manufacturer's number integral to the frame or receiver of any firearm[.]" 18 Pa.C.S.A. § 6117(a). Based upon our research, it does not appear that any Pennsylvania appellate court has explicitly ruled whether a violation of section 6117(a) is a *crimen falsi* offense.

Section 6117 is part of the Pennsylvania's Uniform Firearms Act, 18 Pa.C.S.A. §§ 6101-6128, "whose purpose is to regulate the possession and distribution of firearms, which are highly dangerous and are frequently used in the commission of crimes, and to prohibit certain persons from possessing a firearm within this Commonwealth." ***Commonwealth v. Ford***, 175 A.3d 985, 992 (Pa. Super. 2017), *appeal denied*, 190 A.3d 580 (Pa. 2018) (citations and quotation marks omitted).

Serial numbers on firearms are important because they help police officers to identify the owner of weapons used to commit crimes. ***See id.*** "To ensure that serial numbers remain intact on firearms, the legislature has prohibited person from defacing these markings, ***see*** 18 Pa.C.S.A. § 6117(a), and from purchasing or obtaining defaced firearms, ***see*** 18 Pa.C.S.A. §

6110.2." *Id.* Thus, the crime prohibited by Section 6117(a) is the obliteration of a serial number, not the mere possession of a firearm with an obliterated serial number. *Commonwealth v. Mason*, 397 A.2d 408, 411 (Pa. 1979).

An essential element of a section 6117(a) offense is the obliteration or defacing of a firearm's serial number. *See id.* Moreover, the legislature purposely enacted laws that distinguish between two types of criminal conduct – the obliteration of serial numbers and the possession of a firearm with an obliterated serial number. We find here that the crime of altering or obliterating marks of identification involves dishonesty because obliterating a serial number involves altering or removing identifying marks is a form of falsification, similar to fraud and/or forgery. Accordingly, we conclude that altering or obliterating marks of identification is *crimen falsi*, and the trial court abused its discretion by barring Appellant from impeaching Knox with his 2015 conviction.

However, such error was harmless in this case.[8] "An error is harmless if it could not have contributed to the verdict, or stated conversely, an error

_____

[8] The Commonwealth did not argue harmless error in its brief, but we can raise the issue *sua sponte*. *See Commonwealth v. Hamlett,* 234 A.3d 486, 492 (Pa. 2020) ("*sua sponte* invocation of the harmless error doctrine is not inappropriate as it does nothing more than affirm a valid judgment of sentence on an alternative basis") (citation omitted); *Commonwealth v. Frein*, 206 A.3d 1049, 1070-71 (Pa. 2019) ("In light of the substantial physical evidence establishing [a]ppellant as the perpetrator of these crimes, we conclude that the trial court's error in denying [a]ppellant's motion to suppress the statements he made in his videotaped interview was harmless");
*(Footnote Continued Next Page)*

cannot be harmless if there is a reasonable possibility the error might have contributed to the conviction." ***Commonwealth v. Poplawski***, 130 A.3d 697, 716 (Pa. 2015) (citation omitted). Harmless error occurs where:

> (1) the error did not prejudice the defendant or the prejudice was de minimis; or
>
> (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or
>
> (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

***Commonwealth v. Fulton***, 179 A.3d 475, 493 (Pa. 2018).

Here, the trial court's error in precluding Appellant from impeaching Knox with his 2015 conviction for altering or obliterating marks of identification did not prejudice Appellant.[9] Knox testified in his prison-issued jumpsuit and told the jury about his *crimen falsi* convictions for robbery, aggravated assault and receiving stolen property. Since Knox admitted committing three crimen falsi convictions, the absence of testimony about one

---

***Commonwealth v. Phillips***, 327 A.3d 1236, 1247 (Pa. Super. 2024) (trial court erred when it denied suppression of defendant's statements; even though Commonwealth did not argue harmless error, it may be raised *sua sponte*, and error was not harmless).

[9] Appellant does not argue that he was prejudiced by the preclusion of this evidence. Rather, he merely argues that the trial court erred in precluding the evidence of Knox's 2015 *crimen falsi* conviction.

- 18 -

additional *crimen falsi* conviction under Section 6117 did not prejudice Appellant. Additionally, defense counsel thoroughly impeached Knox with the evidence of his other *crimen falsi* convictions and with his inconsistent testimony throughout prior court proceedings in this case. Even assuming that the absence of evidence concerning Knox's conviction under Section 6117 prejudiced Appellant, the evidence against Appellant was so overwhelming that the prejudice caused by the error could not have affected the verdict. In addition to the testimony of Exum and Knox, the Commonwealth introduced cell phone data which showed Appellant's movements on the day of the murder and demonstrated that he was in the vicinity of the murder. Thus, the court's error in excluding evidence of Knox's conviction does not entitle Appellant to relief.

Lastly, Appellant's counsel, Attorney Deschler, argues that the trial court erred when it denied his motion to withdraw, which was filed after the notice of appeal in this case. Appellant was represented by private counsel, David S. Nenner, Esquire, throughout trial and sentencing. On November 21, 2023, the trial court granted Attorney Nenner's request to withdraw and appointed Attorney Deschler to represent Appellant.

Appellant filed a notice of appeal on March 19, 2024. On March 21, 2024, the trial court directed Appellant to file a 1925(b) statement. Attorney Deschler filed a petition for leave to withdraw as counsel and a request for an extension of time to file the 1925(b) statement on April 3, 2024. A hearing

was held on counsel's motion on April 8, 2024, and it was denied. On April 11, 2024, Appellant filed his 1925(b) statement. Thereafter, Appellant requested, and was granted, leave to amend his 1925(b) statement to include the claim that the trial court abused its discretion when it denied counsel's request to withdraw. The amended 1925(b) statement was filed on April 17, 2024.

We review the denial of a request for the appointment of new counsel under an abuse of discretion standard.[10] ***Commonwealth v. Cook***, 952 A.2d 594, 610 (Pa. 2008). "While an indigent [defendant] is entitled to free counsel, he [or she] is not entitled to free counsel of his [or her] own choosing." ***Id.*** (citations omitted). Pennsylvania Rule of Criminal Procedure 122(c) provides that "[a] motion for change of counsel by a defendant to whom counsel has been appointed shall not be granted except for substantial reasons." Pa.R.Crim.P. 122(c). Case law has established that "substantial reasons" require the defendant to demonstrate that he or she has an "irreconcilable difference" with counsel that precludes counsel from representing the defendant. ***Commonwealth v. Wright***, 961 A.2d 119, 134

---

[10] Neither the parties nor the trial court addressed whether the trial court had jurisdiction to entertain a motion to withdraw subsequent to Appellant's appeal. Nevertheless, we are satisfied that the court had jurisdiction to entertain this motion under Pa.R.A.P. 1701(a), which provides that after an appeal is taken, the court may "take such action as may be necessary to preserve the *status quo* . . . and take other action [that is] otherwise ancillary to the appeal . . ."

(Pa. 2008). A "substantial reason" or "irreconcilable difference" is not established "where the defendant merely alleges a strained relationship with counsel, where there is a difference of opinion in trial strategy, where the defendant lacks confidence in counsel's ability, or where there is brevity of pretrial communication." *Commonwealth v. Floyd*, 937 A.3d 494, 497 (Pa. Super. 2007) (citation omitted).

Here, Appellant directed Attorney Deschler to file a request to withdraw when he learned that Attorney Deschler previously represented Knox, a key Commonwealth witness against Appellant, during the time that Appellant's case was pending. N.T. Hearing, 4/8/24, at 4-5. Attorney Deschler did not represent Appellant at trial; he was appointed for purposes of appeal. He represented Knox in 2023 on an unrelated matter and Knox was sentenced prior to Appellant's retrial. *Id.* at 5. There was no plea offer or agreement with the Commonwealth that Knox would receive favorable treatment in exchange for his testimony against Appellant. *Id.* As such, Attorney Deschler did not believe there was a conflict of interest but filed the motion at Appellant's direction. *Id.*

Appellant testified that he was "very uncomfortable" with Attorney Deschler representing him on appeal. *Id.* at 8. He also claimed that Attorney Deschler was not prepared to file a 1925(b) statement or represent him on appeal. *Id.* at 9. The trial court denied Appellant's request, in part, because it did not believe it could extend the time to file a 1925(b) statement nor

- 21 -

extend the time it had to file its Pa.R.A.P. 1925(a) opinion. *Id.* at 6-7, 11. The trial court also found that there was no conflict of interest and Appellant was not entitled to substitute counsel. *Id.* at 11.

We discern no abuse of discretion. Appellant's stated reason for wanting to substitute counsel was because he was "uncomfortable" knowing that Attorney Deschler represented Knox in an unrelated matter while Appellant's case was pending. Attorney Deschler was not trial counsel. He stated that Knox was sentenced before Apellant's retrial; therefore, there was no deal for testifying against Appellant when he had yet to do so. Attorney Deschler raised several claims in the 1925(b) statement, including one involving Knox, his former client. Accordingly, the trial court did not abuse its discretion when it denied Attorney Deschler's request to withdraw because Appellant failed to demonstrate that he had an irreconcilable difference with counsel that precluded counsel from representing him. *See Wright*, *supra*; *Floyd*, *supra.*

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/14/2025